Zick RUBIN, Plaintiff,

v.

BROOKS/COLE PUBLISHING CO. and
Wadsworth, Inc., Defendants.

Civ. A. No. 90–12011–Y.

United States District Court,
D. Massachusetts.

Oct. 29, 1993.

David J. Fine, Dangel & Fine, Boston, MA, for plaintiff.

Thomas M. Hemnes, Peter M. Casey, Foley, Hoag & Eliot, Maria E. Recalde, Michael R. Gottfried, Burns & Levinson, Boston, MA, for defendants.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

"It is said that hard cases make bad law. This is a hard case." *Scarpa v. DuBois*, No. Civ. A. 92–12948, 1993 WL 245655 (D.Mass. June 24, 1993). As such, it is one that cries out for a fact-specific judgment, not the application of a sweeping principle. The matter comes before the Court as a case stated. That is, the parties have stipulated to all material facts and it remains for this Court to review the record, draw such inferences as are reasonable and, applying the governing law, enter such judgment as may be appropriate. *Continental Grain v. Puerto Rico Maritime Shipping Auth.*, 972 F.2d 426, 429 (1st Cir.1992); *Boston Five Cents Sav. Bank v. Secretary of Housing & Urban Development*, 768 F.2d 5, 12 (1st Cir.1985).

Psychologist and author Zick Rubin ("Rubin") is the creator of a copyrighted psychological instrument known as the "Love Scale." Rubin here sues Brooks/Cole Publishing Co. ("Brooks/Cole") and its parent company Wadsworth, Inc. ("Wadsworth") for copyright infringement under 17 U.S.C. § 501, and for unfair competition and unfair and deceptive business practices under Mass. Gen.L. ch. 93A. Rubin bases his claims upon Brooks/Cole's reproduction of the Love Scale without his permission in several editions of its textbook *Social Psychology*, initially published in 1986. In resolving Rubin's claims, this Court necessarily must address both the

scope of the fair use doctrine and the preemptive reach of the Copyright Act upon related state law causes of action.

## I. FACTUAL BACKGROUND

### A. The Love Scale and its Market

In 1968 and 1969, Rubin, who is now an adjunct professor of psychology at Brandeis University, created a self-report instrument called a "Love Scale," together with a parallel "Liking Scale," as a central part of his doctoral work in social psychology at the University of Michigan. In 1969, Rubin published his Love and Liking Scales in his doctoral dissertation, "The Social Psychology of Romantic Love," (Joint Pre–Trial Mem. Ex. 2), for which he secured Copyright No. A146094 in his own name. Rubin's dissertation is based on the theory that love consists of three critical components—"affiliative and dependent need," "pre-disposition to help," and "exclusiveness and absorption"—and incorporates the Love and Liking Scales (which each consists of 13 questions designed to elicit and rate one's feelings toward another person) as research instruments designed to exemplify and validate his theory.

In 1970, Rubin again published the Love and Liking Scales in his article "Measurement of Romantic Love," (Defs.' Mem.Supp. Summ.J.Ex. B), appearing in the October 1970 issue of *Journal of Personality and Social Psychology*, published by the American Psychological Association ("APA"). The APA secured Copyright No. B624309 on that issue, but in 1978 assigned to Rubin that portion of the copyright which covered his article. In 1973, Rubin published the Love Scale in his social psychology textbook, *Liking and Loving: An Approach to Social Psychology*, (*see* Rubin Aff.Ex. D), published by Holt, Rinehart & Winston. Holt, Rinehart & Winston originally secured copyright No. A582977 on the book, but transferred the copyright to Rubin in 1978. *Liking and Loving* has been widely adopted in social psychology courses and has sold more than 50,000 copies. (Rubin Aff. ¶ 12.) In 1974, an excerpt from *Liking and Loving* that included the Love Scale was reprinted by permission in an anthology that Rubin edited entitled *Doing Unto Others: Joining, Molding,* *Conforming, Helping, Loving*, published by Prentice–Hall Spectrum Books. (Rubin Aff. ¶ 20.) Rubin has received substantial royalties from the sales of *Doing Unto Others*. (*Id.*)

In February 1975, Reader's Digest expressed an interest in reprinting the Love Scale and offered to pay Rubin "well" in the event of such a use. (Rubin Aff. ¶ 24 & Ex. K.) Rubin declined such permission. In August 1977, Boston Magazine reprinted the Love Scale (along with the parallel Liking Scale) as a self-test, without receiving permission from Rubin or any other copyright holder. (Rubin Aff. ¶ 25.) Rubin sued Boston Magazine for copyright infringement and was awarded statutory damages and attorney fees. (*Id.*) The award was upheld by the Court of Appeals for the First Circuit. *Rubin v. Boston Magazine Co.*, 645 F.2d 80 (1st Cir.1981). The Love Scale also appeared in two psychology texts in the mid–1970s without Rubin's permission, and Rubin obtained a promise from at least one of the authors that the Love Scale would be deleted from future editions of that author's book. (Rubin Dep. at 20–25.)

In 1981, Harper & Row published an introductory textbook written by Rubin and a co-author, *The Psychology of Being Human*, along with an accompanying activity book by William Gray and Brian Gerrard, *Understanding Yourself and Others: A Student Activity Book of Psychological Experiments and Activities. Understanding Yourself and Others* was marketed in conjunction with *The Psychology of Being Human* and included, with Rubin's permission, the full text of the Love Scale to be used as a student self-test. (Rubin Aff. ¶¶ 14–15 & Ex.H.) *The Psychology of Being Human* sold more than 130,000 copies and Rubin received substantial revenues from those sales. (Rubin Aff. ¶ 16.)

Rubin has received (and continues to receive) many requests from publishing houses and authors to reprint the Love Scale (often together with his parallel Liking Scale) in textbooks and other publications. (Rubin Aff. ¶ 18 & Ex. I; Rubin Dep. at 47.) Rubin has customarily declined such requests to reprint the Love Scale in full, but has consis-

tently given authors and publishers permission to reprint up to three sample items for no fee, and has consistently allowed "legitimate researchers" to use the entire Love Scale in research for no fee. (Rubin Aff. ¶ 19; Rubin Dep. at 57.) Rubin has also allowed the Love Scale to be reprinted in full on at least ten occasions since 1974 either by itself (sometimes together with the Liking Scale) or as part of a longer article or excerpt, on "many" of these occasions for a fee. (Rubin Aff. ¶¶ 19, 21; Rubin Dep. at 13–14.) Rubin's article "Measurement of Romantic Love," for example, has been reprinted in at least six anthologies and books of readings to date, including Wayne Lesko's *Readings in Social· Psychology*, published in 1991. (Rubin Aff. ¶ 21 & Ex. J.)

Rubin's Love Scale is considered by a large number of psychologists and social psychologists to be an important scientific work, (Rubin Aff. ¶ 44), and both "Measurement of Romantic Love" and *Liking and Loving* are widely available in libraries throughout the United States. (Rubin Aff. ¶ 41; Pollender Aff.) The Love Scale has also been widely used in psychological research, (Rubin Dep. at 29, 58; Rubin Aff. ¶ 43), and has been discussed in virtually every introductory social psychology textbook in the last 20 years (generally with a few sample items appearing). (Rubin Aff. ¶ 44; Krupat Aff. ¶ 3; Peplau Aff. ¶ 4.)

As recently as 1988, the Love Scale was reprinted without Rubin's permission in both a trade book published by Andromeda Oxford Ltd. and in *Self* Magazine (which purportedly had acquired the right to reprint from Andromeda Oxford Ltd.). As a result of a February 1990 settlement, Rubin was paid $20,000 in damages and permission fees. (Rubin Aff. ¶ 26.)

### B. The Defendants' Use of the Love Scale

On three occasions prior to 1986, authors or agents of Brooks/Cole or Wadsworth requested Rubin's permission to publish the Love Scale in Brooks/Cole or Wadsworth textbooks. (Rubin Aff. ¶¶ 27–30 & Exs. M, N, O.) The last two times, in 1978 and 1979, permission was originally sought from the APA and the APA "granted" permission subject to Rubin's approval. (*See* Rubin Aff. Exs. M, N.) In neither case did the APA mention that it had transferred its Love Scale copyright (the "Measurement of Romantic Love" copyright) to Rubin sometime in 1978 (the 1978 request may have predated the transfer). (*See id.*) Rubin denied permission to print more than a sample of three items from the Love Scale in both cases. (*See id.*)

On September 4, 1986, Brooks/Cole sought permission from the APA to reprint the Love Scale in a social psychology textbook written by Donelson Forsyth ("Forsyth") entitled *Social Psychology*, (Recalde Aff.Ex. A), scheduled for publication by Brooks/Cole in early October of that same year. (Haga Aff. ¶ 2 & Ex. 1.) Carline Haga ("Haga"), the Permissions Manager at Brooks/Cole since 1982, was unaware of the previous requests by Brooks/Cole or Wadsworth authors to reprint the Love Scale, and sought permission from the APA rather than from Rubin because she believed that the APA still held the copyright to Rubin's work. (Haga Suppl. Aff. ¶¶ 1, 2, 9.) Haga does not explain why she sought the APA's permission to reprint the Love Scale so late in the publication process.

The APA responded by letter to Haga's request several days before the publication of *Social Psychology*, stating that permission was waived for authors who wished to reproduce a single table or figure provided that the original author's approval was obtained, but also noting that it would waive permission entirely if Rubin could not be located. (Haga Aff. ¶ 3 & Ex. 2.) The APA did not inform Brooks/Cole that it no longer owned the copyright to the Love Scale. (*See id.*) In view of the short time frame and because, based on the APA's letter, Haga believed that obtaining Rubin's permission was merely a courtesy, and also because Haga assumed that Brooks/Cole's use of the Love Scale was permissible fair use, Brooks/Cole did not seek Rubin's permission to reprint the Love Scale. (Haga Aff. ¶ 5; Haga Suppl. Aff. ¶¶ 3–4.)

Brooks/Cole published *Social Psychology* on or about October 10, 1986, and sent Rubin a free examination copy. (Haga Aff. ¶ 5.)

On pages 310–312 of the 651–page text, Forsyth introduces "Zick Rubin's 'Love Scale'" as "the most widely used measure of love," and then discusses Rubin's work and the Love Scale in a "Focus" box before reproducing the Love Scale in its entirety along with self-scoring instructions. On page 325, in the "For More Information" section at the end of the chapter, Forsyth lists *Liking and Loving,* by Zick Rubin" as suggested reading, and provides a brief and complementary description of the book. On page 649, in the "Credits" section at the end to the text, Forsyth attributes the Love Scale to "'Measurement of Romantic Love,' by Z. Rubin. ... Copyright 1970 by the American Psychological Association. Reprinted by Permission."

On November 13, 1986, Rubin wrote to the APA about the unpermitted use of the Love Scale in *Social Psychology.* (Rubin Aff. ¶ 34.) Shortly thereafter, the APA notified Brooks/Cole of Rubin's objections. (Haga Aff. ¶ 7.) On November 26, 1986, Haga sent Rubin a letter indicating that, while Brooks/Cole believed its use of the Love Scale was permissible and fair use given the scholarly purpose of the material in the text, Brooks/Cole would nevertheless be pleased to offer Rubin a permission fee of $150. (Haga Aff. ¶¶ 7–8 & Ex. 3.)

On April 16, 1987, having heard no response from Rubin, Haga wrote to Forsyth stating that she assumed that Rubin concurred that the use of Love Scale in *Social Psychology* was fair use, but requested that Forsyth consider using only items 1–6 of the Love Scale in the event that Rubin responded negatively to her November 26, 1986 letter. (Haga Suppl.Aff. ¶ 7–8 & Ex.A.) Forsyth responded that he would prefer not to make the changes unless absolutely necessary since he feared that the whole Love Scale section would have to be rewritten. (Haga Suppl.Aff.Ex.B.) Rubin did not respond to Haga's November 26, 1986 letter for several years, however, (Rubin Dep. at 84), and in the meantime Brooks/Cole published the Love Scale in both the second and third printings of *Social Psychology.* (*See* Fine Aff.Exs. B, C.)

On November 21, 1989, Rubin finally responded to Brooks/Cole's November 26, 1986 letter, claiming that Brooks/Cole's use of the Love Scale was not fair use, and demanding that Brooks/Cole pay damages and withdraw all copies of *Social Psychology.* (Haga Aff. Ex. 4.) On January 2, 1990, Brooks/Cole's counsel sent Rubin a letter stating that Brooks/Cole would not cease publication of the textbook. (Rubin Aff. ¶ 12.)

Rubin filed the instant Complaint on August 21, 1990, asserting a copyright infringement claim under 17 U.S.C. § 501, and a claim for unfair competition and unfair and deceptive business practices under Mass. Gen.L. ch. 93A. On March 9, 1993, the Court denied the parties' cross-motions for summary judgment. On July 2, 1993, the parties agreed to submit the case before the Court for final disposition upon a "case stated" basis (i.e., on the record before the Court).[1]

## II. ANALYSIS

### A. Copyright Claim: Fair Use

■ Brooks/Cole concedes copying Rubin's copyrighted material,[2] so the Court jumps directly to considering the defense of fair use. Under 17 U.S.C. § 107, the "fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." The factors to be considered in determining whether use of a work is fair use include:

> (1) the purpose and character of the use, including whether such use is of a commer-

---

1. At oral argument on July 27, 1993, the Court, ruling from the bench, found in favor of Rubin on the issues of laches, estoppel, and waiver, but took the remaining issues discussed here under advisement.

2. To establish a prima facie case of copyright infringement, two elements must be proved: (1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original. *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). The satisfaction of these two elements is not in dispute.

cial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. These factors are neither exclusive nor should any one factor be determinative. Rather, the factors should be considered "in light of the purpose of the fair use doctrine: to prevent strict enforcement of the copyright law when its enforcement 'would inhibit the very Progress of Science and useful Arts that copyright is intended to promote.'" *Penelope v. Brown,* 792 F.Supp. 132, 136 (D.Mass.1992) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 477, 104 S.Ct. 774, 806, 78 L.Ed.2d 574 [1984] [Blackmun, J., dissenting] ). It is the defendant's burden to prove that the copying is justified under the fair use doctrine. *Penelope,* 792 F.Supp. at 136.

### 1. Purpose and Character of the Use

■ Courts typically consider three subfactors when examining the purpose and character of an alleged infringer's use of a copyrighted work: (1) whether the use was productive; (2) whether the use was commercial; and (3) whether the alleged infringer's conduct was proper. *Penelope,* 792 F.Supp. at 136. Examination of these subfactors reveals that the purpose and character of Forsyth's copying favors a finding of fair use.

■ The Supreme Court has held that a "productive use" of a copyrighted work, though not determinative, favors a finding of fair use. *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 561, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588 (1985); *Sony Corp.,* 464 U.S. at 455 n. 40, 104 S.Ct. at 795 n. 40; *Penelope,* 792 F.Supp. at 136. A "productive use" is one that "result[s] in some added benefit to the public beyond that produced by the first author's work." (*Sony Corp.,* 464 U.S. at 478, 104 S.Ct. at 807 [Blackmun, J., dissenting] ). A defendant need not show that the use "genuinely and substantially benefitted the public," but only

that the use "could have benefitted the public marginally." *Penelope,* 792 F.Supp. at 137; *see Harper & Row,* 471 U.S. at 561, 105 S.Ct. at 2231. This factor has also been phrased as whether the copied material was published to supersede the use of the original work. *Penelope,* 792 F.Supp. at 136; *Haberman v. Hustler Magazine, Inc.,* 626 F.Supp. 201, 210 (D.Mass.1986).

■ *Social Psychology* presents the Love Scale in a productive and scholarly manner, and does not supersede Rubin's work. As a college textbook, *Social Psychology* is circulated within an educational setting for the purposes of teaching and higher learning. "Rubin's 'Love Scale'" is introduced in Forsyth's chapter on "Personal Relationships," and appears amidst a "Focus" section in which Forsyth compares the two types of love discussed in the chapter, "passionate love" and "companionate love," with Rubin's tripartite theory of love—"attachment," "caring" and "intimacy" (as restated by Forsyth)—upon which Rubin's Love Scale is based. Forsyth then lists the Love Scale items in reorganized order, noting that "passionate love" encompasses Rubin's "attachment" component (and items 1–5 on the reorganized Love Scale), while "companionate love" consists of Rubin's "caring" and "intimacy" components (reorganized Love Scale items 6–9 and 10–13). Forsyth also encourages the reader to question the validity of the Love Scale, asking "[d]o the items really measure love?," and suggests the possible implications of higher test results on items corresponding to any particular one of Rubin's three love components.

■ Rubin argues that Forsyth's full production of the Love Scale (as opposed to three sample items, each representing one of Rubin's components of love) was unnecessary, and that Forsyth incorporated the Love Scale only as "a self-test to entertain students" and as "a student involvement feature." (*See* Rubin Aff. ¶¶ 45–46; Krupat Aff. ¶ 5; Peplau Aff. ¶ 6; *but see* Forsyth Aff. ¶ 9.) The Court agrees that the Love Scale acts as a student involvement feature, but fails to see how that use is necessarily inconsistent with the productive purposes of schol-

arship and teaching. Student involvement features such as the Love Scale are often powerful teaching devices, *see* Forsyth Aff. ¶ 9, and perhaps particularly so when they are sufficiently entertaining to relieve the periodic doldrums of the average college textbook. Accordingly, although student readers might admittedly derive entertainment as well as erudition from Forsyth's inclusion of the Love Scale, Forsyth does use the Love Scale for scholarly and pedantic purposes.

Rubin also claims that Forsyth's use of the Love Scale cannot properly be considered productive because Forsyth incorrectly asserts that "[a] score of 90 is average for college-aged men and women in romantic heterosexual relationships."[3] The commission of errors in an allegedly infringing work has been held relevant to whether a use is considered productive. *See Maxtone–Graham v. Burtchaell,* 803 F.2d 1253, 1261 (2d Cir.1986), *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987). Even were the Court to find an inaccuracy in Forsyth's extrapolation, however, such an inaccuracy would fall far short of that necessary to discredit the entire productive application of Forsyth's use of the Love Scale. *See Penelope,* 792 F.Supp. at 136–137 (inaccuracies irrelevant as long as the alleged infringing work benefits the public marginally); *Haberman,* 626 F.Supp. at 210 (noting the dangers in the copyright context of evaluating the merit of a publication). Accordingly, the Court finds that Forsyth's use of the Love Scale is productive.

■■■■ As to the second subfactor, commercial use, the relevant question "is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Penelope,* 792 F.Supp. at 137; *Haberman,* 626 F.Supp. at 210–11. If a book

falls into one of the enumerated fair use categories [i.e., criticism, teaching, scholarship or research], as *Social Psychology* does, there is a "strong presumption" that the use is productive "even though, as will often be the case, the biographer and publisher 'anticipate profits.'" *See Wright v. Warner Books, Inc.,* 953 F.2d 731, 736–37 (2d Cir. 1991) (citation omitted). Here, Forsyth included the Love Scale to strengthen the book's chapter on "Personal Relationships," as well as the book's student involvement theme which, in Forsyth's words, includes "a self-test in practically every chapter of the book." (Forsyth Aff. ¶ 9.) The Love Scale alone, however, constitutes only one of many self-tests in *Social Psychology,*[4] and is reproduced on only one of 651 pages. Moreover, the book's student involvement theme, while clearly an enhancement to the text, is clearly not its sole and central attribute. In short, Forsyth's student involvement theme, let alone his book as a whole, can hardly be said to depend for its vitality on the Love Scale and thus, although the defendants certainly stood to profit from Forsyth's book, it is difficult to see how they stood to profit directly from the Love Scale. *See Penelope,* 792 F.Supp. at 137 (copied material consisted of only a few scattered lines amongst five pages of a 218–page text).

Rubin claims that the Love Scale was exploited in order to promote the sale of *Social Psychology.* Whether the inclusion of copied material was made evident to prospective purchasers has been held relevant when considering whether the alleged infringer profited from use of the copied material. *Penelope,* 792 F.Supp. at 137. Here, Brooks/Cole's advertising folder never specifically mentions the Love Scale, and the folder's "Table of Contents Summary" lists all of the book's "Focus" sections (including the Love Scale "Focus" section) in the same fine print. (*See* Joint Pre–Trial Mem.Ex. 4.)[5] It is also

---

3. Rubin claims that Forsyth incorrectly extrapolates from the average score that Rubin reported for his initial sample of couples at the University of Michigan in the late 1960s. In response, the defendants claim that this is simply Forsyth's valid interpretation of Rubin's findings.

4. As an example, Chapter 7 includes tests and exercises on affiliation, shyness, sexuality, loneliness, ingratiation, and love (the Love Scale), as well as discussing and presenting the results of numerous other tests and studies.

5. The advertising folder's Table of Contents summary admittedly lists the title of the Love Scale's

relevant to note that, while Brooks/Cole sent sample copies of *Social Psychology* to prospective purchasers as part of its marketing scheme, the Love Scale is not placed in a desirable marketing position in the book since it is printed inconspicuously on the backside of page 312 of a 651–page text, and Rubin has produced no evidence that Brooks/Cole's salespeople brought the Love Scale to the attention of prospective purchasers. Accordingly, the Court finds that Brooks/Cole did not exploit the Love Scale, and that its use of the Love Scale was primarily productive rather than commercial. *Compare Rubin*, 645 F.2d at 82, 84 (Boston Magazine featured Love Scale article under the cover headline "How's Your Love Life?" and the sub-caption "Who Turns You On and Why? Science may have the answer," and included the Love Scale only "as a quiz to entertain readers of a magazine of general circulation").

■■■ The final subfactor to be considered is the propriety of Brooks/Cole's and Wadsworth's conduct. *Harper & Row*, 471 U.S. at 562, 105 S.Ct. at 2231; *see, e.g., Marcus v. Rowley*, 695 F.2d 1171, 1175–76 (9th Cir.1983) (no attempt to secure permission or to credit copyright owner weighs against fair use). Rubin claims that Brooks/Cole committed bad faith (and breached industry standards)[6] through the following acts: (1) attempting to obtain permission from the APA (rather than Rubin) only a month before publishing the text, despite the fact that Rubin had previously denied other Brooks/Cole and Wadsworth authors permission to reprint the Love Scale; (2) incorrectly stating that the Love Scale was "reprinted by permission"; and (3) "backdating" permission letters sent to thirty other authors whose works were also reprinted in *Social Psychology*.[7]

When viewed in the overall context, however, the acts complained of are insufficient to preclude a finding of fair use. *Cf. Harper & Row*, 471 U.S. at 563, 105 S.Ct. at 2232 (the defendant "knowingly exploited a purloined manuscript"). As stated by the Court of Appeals for the Second Circuit, "lack of permission is 'beside the point' as long as [the defendant's] use meets the standards of fair use." *Wright*, 953 F.2d at 737; *see Maxtone–Graham*, 803 F.2d at 1257, 1264 (fair use defense upheld where defendant was denied permission to quote plaintiff's words but used quotes anyway and gave attribution to plaintiff); *Fisher v. Dees*, 794 F.2d 432, 438 (9th Cir.1986) (fair use defense not precluded even though permission was denied); *compare Weissmann v. Freeman*, 868 F.2d 1313,

---

Focus section, *"Experiencing Social Psychology—Are you in love?,"* along with a small caption which promotes the chapter's "applications viewpoint," but these details do not exploit the Love Scale for the following reasons: (i) many of the book's focus sections (which are all listed in the folder's Table of Contents summary) are entitled with similarly inviting personalized questions (i.e., *"Experiencing Social Psychology—How can you get someone to like you?"* [another focus section within the Love Scale chapter]), and thus the title of the Love Scale focus section does not draw particular attention to itself; (ii) the "applications viewpoint" caption is located decidedly above the Love Scale Focus section (i.e., at the top of the chapter summary), and thus also does not invite particular attention to the Love Scale focus section; and (iii) as discussed in the previous footnote *supra*, the Love Scale chapter includes many tests and exercises in addition to the Love Scale to which the "applications viewpoint" caption justifiably applies. Accordingly, the Table of Contents summary does not exploit the Love Scale.

**6.** Rubin contends that Brooks/Cole violated both its own internal permissions standards, (*see The*

Brooks/Cole's Author's Guide, Fine Suppl.Aff.Ex. C), as well as industry-wide practice. (*See* Houghton Mifflin's "Legal Considerations for Authors" brochure, DeRocco Aff.Ex.A.) The Court finds these industry-guidelines excerpts irrelevant for the following reasons. First, to the extent that the guidelines merely provide an interpretation of copyright law and the fair use doctrine, (*see, e.g.,* DeRocco Aff.Ex. A), they have no precedential impact either upon Brooks/Cole or upon this Court. Second, as explained below, lack of permission (whether or not in compliance with industry or internal company standards) is entirely beside the point in cases in which reproduction of copyrighted material is otherwise "fair use." *See Wright*, 953 F.2d at 737.

**7.** The thirty permission letters to which Rubin refers are all dated "10/20/86," but are marked "received" by the authors as of various dates in early December 1986. (*See* Fine Aff.Ex.F.) The Court finds that Brooks/Cole sent these letters out in hindsight in late November or early December, 1986, after learning of Rubin's objections to its use of the Love Scale and, indeed, backdated the letters to make them appear more timely.

1324 (2d Cir.1989) (defendant not only neglected to credit author, but attempted to pass off the work as his own, substituting his name in place of author's), *cert. denied*, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989); *Marcus v. Rowley*, 695 F.2d 1171, 1175–76 (9th Cir.1983) (no credit to author). Here, Brooks/Cole obtained the Love Scale through legitimate channels, credited Rubin clearly and favorably in the text, sent Rubin a free examination copy immediately after publishing the text, offered Rubin a $150 permission fee after hearing of his initial objection, and considered removing the Love Scale in the event that Rubin continued to protest. In addition, although Brooks/Cole incorrectly stated that the Love Scale was "reprinted with permission," the Court finds that, in view of the APA's former ownership of the copyright and its somewhat misleading reply to Brooks/Cole's September 4, 1986 letter, Brooks/Cole's error constituted at most negligent rather than intentional misrepresentation. Finally, although the Court is disturbed by Brooks/Cole's dishonest attempt to appease other authors who on hindsight might have shared Rubin's objections with respect to their own reprinted works, the Court finds that the backdated letters have little relevance to Brooks/Cole's controversy with Rubin. Accordingly, the Court does not believe that the acts complained of preclude a finding of fair use.

In sum, the Court finds that the productive and primarily noncommercial nature of the defendants' use of the Love Scale causes factor one—the "character of the use"—to favor the defendants.

### 2. *Nature of the Copyrighted Work*

 In analyzing the second statutory factor, the law generally recognizes a greater need to disseminate (and thus provides lesser protection to) factual works than works of fiction or fantasy. *Harper & Row*, 471 U.S. at 563, 105 S.Ct. at 2232. Somewhat similarly, scientific works, when used for scientific, scholarly, or like purposes, receive somewhat less protection than do non-scientific works. *Sampson & Murdock Co. v. Seaver–Radford Co.*, 140 Fed. 539, 541 (1st Cir.1905) ("works in regard to the arts and sciences ... [are] given out as a development in the way of progress, and, to a certain extent, by common consent ... others interested in advancing the same art or science may commence where the prior author stopped"); *see Rubin*, 645 F.2d at 84; *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir.1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); *Greenbie v. Noble*, 151 F.Supp. 45, 67–68 (S.D.N.Y.1957); *Loew's, Inc. v. Columbia Broadcasting System*, 131 F.Supp. 165, 175 (S.D.Cal.1955), *aff'd*, 239 F.2d 532 (9th Cir.1956), *aff'd*, 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed.2d 583 (1958); 2 Goldstein, *Copyright* § 10.2.2(a), at 227 (1989) ("the scientific nature of the plaintiff's work will weigh in favor of the copier whose purposes are similarly scientific").[8] The Love Scale is an important and widely studied creative scientific construct that has been discussed in virtually every social psychology text in the last twenty years, which Brooks/Cole has reproduced for similarly scientific and pedantic purposes. Thus, although as a creative work the Love Scale might normally receive heightened protection, the putative degree of enhanced protection is significantly outweighed by the Love Scale's scientific nature and the scientific nature of its reproduction.

 The scope of fair use is also narrower with respect to unpublished as op-

---

8. Rubin argues that the *Sampson* doctrine has fallen into disfavor, *see* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.-05[A][2] at 13–102.57 (1993) ("it seems doubtful that a modern court would apply the *Sampson* doctrine, based as it is upon the manifestly fictitious consent of the copyright owner"), but this Court, like other courts and commentators, *see* citations in accompanying text *supra*, sees substantial merit in the *Sampson* court's reasoning, and agrees that scientific works, while clearly not subject to limitless fair use in the scientific arena, *see Pacific and Southern Co. v. Duncan*,

744 F.2d 1490, 1497 (11th Cir.1984) ("courts should also take care not to discourage authors from addressing important topics for fear of losing their copyright protection"), *cert. denied*, 471 U.S. 1004, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985), justifiably receive somewhat lesser protection when reproduced for similarly scientific purposes (such as the teaching of science). *See also Rubin*, 645 F.2d at 84 (in which the First Circuit factually distinguished but neither disavowed nor questioned the vitality of the *Sampson* doctrine).

posed to published works. *Harper & Row,* 471 U.S. at 564, 105 S.Ct. at 2232 ("the author's right to control the first public appearance of his expression weighs against ... use of the work before its release"). Here, Rubin's Love Scale had been widely published in several articles and in numerous texts before its reproduction in *Social Psychology,* and thus it receives a much more limited protection than would an unpublished work.[9]

In sum, due to the Love Scale's previously published scientific nature, and the scientific and scholarly nature of its reproduction, the second statutory factor also favors a finding of fair use.

### 3. Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole

Analysis of this factor requires a determination of both the quantitative and qualitative substantiality of Brooks/Cole's use of Rubin's copyrighted work. *Penelope,* 792 F.Supp. at 138. The Love Scale, while quantitatively only a small portion of Rubin's copyrighted works, was a critical and central component of two of these works—Rubin's doctoral dissertation and his article "Measurement of Romantic Love"—and thus Brooks/Cole's qualitatively substantial use of the Love Scale "militate[s] against a finding of fair use." *Sony Corp.,* 464 U.S. at 450, 104 S.Ct. at 792; *see Rubin,* 645 F.2d at 84. Substantial copying by a defendant, however, "does not automatically preclude the fair use defense," *Fisher,* 794 F.2d at 438, for "it has long been recognized that a commentator may fairly reproduce as much of the original, copyrighted work as is necessary to his proper purpose." *Haberman,* 626 F.Supp. at 212 (for purposes of commentary on copyrighted photographs, full reproduction was appropriate). Although Forsyth admittedly could have derived some productive application from the use of only a few sample items from the Love Scale (as other authors have), his full reproduction of the Love Scale provided a productive enhancement to his discussion of Rubin's work which could not have been fully accomplished had he used only a few sample items. *See* discussion of the first factor *supra.* Accordingly, Brooks/Cole's qualitatively substantial copying is ameliorated by Forsyth's beneficial use of the entire Love Scale, and the Court therefore finds that the third factor points only slightly in Rubin's favor.

### 4. Effect of the Use upon the Potential Market For or Value of the Copyrighted Work

The final factor, market effect, is "undoubtedly the single most important element of fair use." *Harper & Row,* 471 U.S. at 566, 105 S.Ct. at 2233; *Penelope,* 792 F.Supp. at 138. In cases of noncommercial use of a copyrighted work, it is the plaintiff's burden to show proof either that the particular use is harmful, or that if the use should become widespread, it would adversely affect either the primary market for the copyrighted work or the current or potential markets for derivative works. *Harper & Row,* 471 U.S. at 568, 105 S.Ct. at 2234; *Sony Corp.,* 464 U.S. at 451, 104 S.Ct. at 792; *Twin Peaks Productions, Inc. v. Publications Int'l Ltd.,* 996 F.2d 1366, 1377 (2d Cir.1993). Since Brooks/Cole's use of the Love Scale in this case was primarily noncommercial (as discussed under the first factor *supra*), it is Rubin's burden to show at least "*some* meaningful likelihood of future harm." *Sony Corp.,* 464 U.S. at 451, 104 S.Ct. at 793; *Maxtone–Graham,* 803 F.2d at 1264.

As a starting point, the Court does not believe that Brooks/Cole's *particular* use of the Love Scale adversely affects either the current or potential markets for Rubin's textbooks and anthologies, or the current or potential markets for licensing of the Love Scale for use by others in the textbook, anthology, or derivative markets (e.g., the popular magazine market). The Love Scale was published in its entirety at least 4 times by Rubin in the late 1960s and early 1970s, at

---

**9.** Lack of availability may also lend greater justification for reproduction. *Penelope,* 792 F.Supp. at 138. Here, however, both Rubin's textbook *Liking and Loving* and his article "Measurement of Romantic Love" are available in libraries across the country, and thus this subfactor is non-dispositive.

least 10 times since 1974 by other authors with Rubin's permission in anthologies and other scholarly books (one anthology as recently in 1991), in at least two textbooks published in the mid–1970s without Rubin's permission, and in numerous research studies, yet Rubin admits that he continues to receive many requests to reprint the Love Scale. (Rubin Aff. ¶ 18 & Ex. I; Rubin Dep. at 47.) Moreover, Rubin admits in his 1992 deposition, taken *six years* after publication of *Social Psychology*, that he still cannot cite any specific instances in which he has suffered economic harm or has been adversely effected by Brooks/Cole's inclusion of the Love Scale in the book. (Rubin Dep. at 86.) [10] In short, despite Rubin's ominous claims and predictions to the contrary (*see* Rubin Aff. ¶¶ 17, 47–50; DeRocco Aff. 9, 15–19), the Court does not find that Brooks/Cole's *particular* use of the Love Scale on page 312 of its 651–page text creates or has created any meaningful likelihood of future harm to the Love Scale markets.

The Court's inquiry does not end here, however, for the Court must also consider whether finding Brooks/Cole's use of the Love Scale will cause such use to "become widespread." *Harper & Row*, 471 U.S. at 568, 105 S.Ct. at 2234; *Sony Corp.*, 464 U.S. at 451, 104 S.Ct. at 793. For reasons similar to those discussed above, the Court does not believe that even widespread replication of Brooks/Cole's use creates a meaningful likelihood of harm to the current or potential markets for Rubin's existing or future textbooks and anthologies. There is simply no credible evidence that even widespread use

of the Love Scale in comprehensive college textbooks, at least in the manner of Brooks/Cole's use, creates a meaningful likelihood of harm to those markets.[11]

Nor does the Court conclude that widespread replication of Brooks/Cole's use adversely affects Rubin's ability to license the Love Scale to others for a fee as part of a larger excerpt or article reprinted in an anthology or book of readings, or for use in alternate or derivative markets. These uses are even further removed from the market for Rubin's textbooks and, in fact, it is "not beyond the realm of possibility that [widespread publication of the Love Scale in college textbooks] might stimulate further interest [for the Love Scale in derivative markets]." *Wright*, 953 F.2d at 739 (citation omitted).

A finding of "fair use," however, would appear necessarily to extinguish Rubin's ability to license the Love Scale to other authors who might wish to reprint the Love Scale for use in a textbook format.[12] From the record, the breadth and potential of this market is difficult to discern. Rubin claims that in "many ... cases" he has "received income" from permission fees to reprint the Love Scale in full, but it appears that of the roughly 10 times that the Love Scale has been reprinted with Rubin's permission since 1974, (see Rubin Dep. at 14), at least 6 of these reprintings were in anthologies rather than in textbooks (for which Rubin received a fee in "most" cases). (Rubin Aff. ¶ 21.) Rubin provides no further useful description either

10. Although Rubin need show only a likelihood of future harm, rather than actual harm, *Sony Corp.*, 464 U.S. at 451, 104 S.Ct. at 793, the Court concludes that events occurring in the *six years* subsequent to Brooks/Cole's publication of *Social Psychology* bear some relevance to the likelihood of future harm.

11. Although both Rubin and Michael DeRocco, Houghton Mifflin's Senior Sponsoring Editor in psychology, claim that the Love Scale serves as a powerful marketing device in college textbooks, (*see* Rubin Aff. ¶ 17; DeRocco Aff. ¶¶ 15–19), there is no evidence that Brooks/Cole used the Love Scale in such a manner, and thus a finding by this Court in favor of Brooks/Cole would not sanction such use. In addition, it is also interesting to note that, despite the Love Scale's purport-

ed market appeal, Rubin himself has declined to reprint the Love Scale in both the current and planned editions of his current introductory psychology textbook, *Psychology*, published by Houghton Mifflin, opting instead for reproduction of only a few sample items. (Rubin Aff. ¶ 17; Rubin Dep. at 68.)

12. Inherent in the Supreme Court's "widespread use" analysis is the requirement that Courts consider the direct consequential impact of a finding of fair use in the particular case. In many cases, as here, the plaintiff's copyright is most endangered, not by the challenged act of reproduction itself but by the danger of subsequent permissible reproductions likely to occur in response to a Court's ruling that the challenged reproduction is fair use.

of the other publications in which the Love Scale has purportedly appeared, or the amounts, if any, paid for those additional reproductions. Indeed, although it appears that many textbook authors have *asked* (and been denied) Rubin's permission to reprint the Love Scale in full, it is unclear whether any *textbook* author has ever *paid* Rubin to reprint the Love Scale in full. In spite of these shortcomings, however, the Court is inclined to infer that at least some market exists for licensing the Love Scale to other textbook authors, and that at least some likelihood exists that this market will be adversely impacted by widespread application of Brooks/Cole's use of the Love Scale.

■ Accordingly, although based mainly on inference, the Court finds that *some* meaningful likelihood of market harm exists, and therefore finds that the market effect factor—the most important factor—points just a tad in Rubin's favor.

### 5. Balancing the Factors

■■ In light of its analysis of the factors above, the Court considers this an extremely difficult case. The productive use of the Love Scale and its previously published scientific nature (i.e., the first and second factors) favor of a finding of fair use, while the market effect, the most significant factor, and the substantiality of the taking (the third and fourth factors) weigh slightly against fair use. The Supreme Court has provided little guidance in such circumstances. *See* 3 Nimmer § 13.05[A][5], at 13–102.66 ("even if the factors are analyzed ... so that two favor a finding of fair use while two disfavor such a finding, there is no guidance as to which conflicting factors prevail over others" [also commenting on slipperiness of all four factors] ). In striking an equitable balance, therefore, the Court rules with respect to

*past* conduct that the very slight preference of the final two factors is outweighed by the slightly more weighty preference of the first two factors. The Court therefore rules that the defendants have met their burden of showing that, with respect to their past conduct, Brooks/Cole's use of the Love Scale was fair use under 17 U.S.C. § 107. The potential "widespread application" of this holding to the future conduct of these defendants and other similarly situated textbook publishers, however, warrants a second look at the four factors with respect to future use. As to the future, this Court, having reweighed the factors, rules that the fourth and most important factor assumes a more hefty significance and the balance tips in Rubin's favor. Thus, while Brooks/Coles use may have been "fair" in the necessarily inchoate world of private ordering, once the historic rights of the parties are balanced by this Court, the very fact of judicial decision affects private conduct in ways that, if continued, will not be fair to Rubin. Accordingly, while Rubin is entitled to no damages from this action, the future unauthorized use of the Love Scale will be enjoined.

### B. Massachusetts Unfair Business Practices Claim

Rubin also asserts a claim for unfair competition and unfair and deceptive business practices under Mass.Gen.L. ch. 93A, to which the defendants raise the defense of federal preemption by the Copyright Act, 17 U.S.C. § 301.[13] Section 301 establishes a bipartite test for determining whether a state statutory or common law claim is preempted. *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 199–200 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *Patricia Kennedy & Co., Inc. v. Zam–Cul Enter-*

---

13. 17 U.S.C. § 301 provides in pertinent part: (a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by section 102 and 103 ... are governed exclusively by this title. Thereafter, no person is entitled to any such right or equiva-

lent right in any such work under the common law or statutes of any State. (b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any state with respect to—

(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by Section 106.

*prises, Inc.,* 830 F.Supp. 53, 55 (D.Mass.1993) (Collings, M.J.). A state law claim is preempted if both parts of the test are satisfied. First, the work of authorship in which rights are claimed must fall within the subject matter of copyright as defined in sections 102 and 103 of the Act. *Harper & Row,* 723 F.2d at 200; *Patricia Kennedy & Co.,* 830 F.Supp. at 55. In the instant case, there is no dispute that the Love Scale is subject to copyright protection.

The second consideration for preemption, and the point of argument here, is whether the state law creates "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified in section 106 of the Act." 17 U.S.C. § 301(a). This requirement has been construed to mean:

> [w]hen a right defined by state law may be abridged by an action which, in and of itself, would infringe one of the exclusive rights [in section 106], the state law in question must be deemed preempted. Conversely, when a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur.

*Harper & Row,* 723 F.2d at 200; *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.,* 650 F.Supp. 838, 849 (D.Mass.1986) *Patricia Kennedy & Co.,* 830 F.Supp. at 55. The rights provided by section 106 are the rights of exclusive reproduction and distribution and, with respect to certain artistic works (not applicable here), the rights of exclusive performance and display. *See* 17 U.S.C. § 106(1)–(5).[14]

 Thus, in order to avoid preemption, a state law claim must have an "extra element" that changes the nature of the action so that it is *qualitatively* different from

a copyright infringement claim. *Computer Associates Intern., Inc. v. Altai, Inc.,* 982 F.2d 693, 716 (2d Cir.1992); *Harper & Row,* 723 F.2d at 201; *Patricia Kennedy & Co.,* 830 F.Supp. at 55. In other words, a cause of action will not be saved from preemption merely by elements such as awareness, intent, or commercial immorality, which alter the action's scope but not its nature. *Computer Associates Intern.,* 982 F.2d at 717; *Nash v. CBS, Inc.,* 704 F.Supp. 823, 832–33 (N.D.Ill.1989), *aff'd,* 899 F.2d 1537 (7th Cir. 1990). Rather, a Court must look beyond the "label affixed" to the cause of action, and must determine "what plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced." *Patricia Kennedy & Co.,* 830 F.Supp. at 56 (citing *Computer Associates Intern.,* 982 F.2d at 716).

 Following the "extra element" test, courts have determined that state law unfair competition and unfair and deceptive trade practices claims based solely upon impermissible replication of copyrighted material are preempted. *See, e.g., M.G.B. Homes, Inc. v. Ameron Homes, Inc.,* 903 F.2d 1486, 1493–94 (11th Cir.1990); *Patsy Aiken Designs, Inc. v. Baby Togs, Inc.,* 701 F.Supp. 108, 110–12 (E.D.N.C.1988); *Patricia Kennedy & Co.,* 830 F.Supp. at 57; *see also Donald Frederick Evans & Assocs., Inc. v. Continental Homes, Inc.,* 785 F.2d 897, 915–916 (11th Cir.1986). On the other hand, when unfair competition and unfair and deceptive trade practices claims require proof of an extra element such as likelihood of consumer confusion, misrepresentation, or deception, the claims survive preemption. *See, e.g., Nash,* 704 F.Supp. at 832–33; *see also Donald Frederick Evans & Assoc.,* 785 F.2d at 915–916; *Storer Cable Communications v. City of Montgomery, Ala.,* 806 F.Supp. 1518, 1532 (M.D.Ala.1992); *Patricia Kennedy & Co.,* 830 F.Supp. at 57;

---

**14.** 17 U.S.C. § 106 provides in pertinent part:

Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

. . . . .

1 Nimmer § 1.01[B][1][e], at 1–21 ("crucial to liability under a deceptive trade practices cause of action is the element of misrepresentation or deception, which is no part of a cause of action for copyright infringement. ... [T]here is [also] no preemption of ... the state law of unfair competition of the 'passing off' variety.")

In *Patricia Kennedy & Co.*, 830 F.Supp. 53, a court in this district addressed the application of the extra element test to a claim asserted under Mass.Gen.L. ch. 93A. In that case, the plaintiff alleged that the defendant had improperly acquired and used an artistic logo created by the plaintiff. Applying the extra element test, Magistrate Judge Collings bifurcated the plaintiff's chapter 93A claim, preempting the portion of the claim based upon the defendant's "subsequent use of the Logo," but allowing the portion of the claim based upon "the defendant's conduct in disputing the origination of the artwork and thus acquiring the logo without payment for services rendered." *Patricia Kennedy & Co.*, 830 F.Supp. at 57. Thus, the court established, and this Court agrees, that although certain elements of a chapter 93A claim may be preempted, other aspects of the claim may still survive preemption if they include the "extra element" necessary *qualitatively* to differentiate that portion of the chapter 93A claim from the claim of copyright infringement.

■ In the instant case, Rubin bases his claim for unfair competition and unfair and deceptive business practices under chapter 93A upon the entirety of Brooks/Cole's conduct. *See* Compl. ¶¶ 31–36. It is clear beyond peradventure, however, that the claim is preempted to the extent it is based directly upon Brooks/Cole's reproduction of the Love Scale, Brooks/Cole's failure to obtain Rubin's permission (at all or in a timely fashion), and Brooks/Cole's continued use of the Love Scale after Rubin's initial and subsequent objections. A chapter 93A claim based upon

these acts asserts rights subsumed within an action for copyright infringement.

■ Rubin's chapter 93A claim is not limited to these acts, however, for Rubin also claims that Brooks/Cole improperly represented that the Love Scale was "reprinted with permission." [15] Although the Court is aware of no case which has addressed preemption by the Copyright Act of a state law claim based upon improper representation of permission, the Court derives guidance from cases considering preemption of unfair competition and deceptive trade practices claims of the "passing off" variety. In these cases, the plaintiffs' claims are based upon mislabeling or misrepresentation by the defendant which fools consumers into thinking that the defendant's product (which might also be an infringing product) is made or authorized by the plaintiff. *See, e.g., Warner Bros. v. American Broadcasting Cos.*, 720 F.2d 231, 247 (2d Cir.1983) (claim that *Greatest American Hero* series misled viewers into thinking that series was produced or authorized by those responsible for the *Superman* films); *Xerox Corp. v. Apple Computer, Inc.*, 734 F.Supp. 1542, 1550 (N.D.Cal.1990); *Nash*, 704 F.Supp. at 833 (applying unfair trade practices statute); 1 Nimmer § 1.01[B][1][e] at 1–21 n. 110. Courts have determined that such claims are not preempted by the Copyright Act based as they are upon an element of misrepresentation and deceit beyond mere reproduction. *See Princess Fabrics, Inc. v. CHF, Inc.*, 922 F.2d 99, 104 (2d Cir.1990); *Warner Bros.*, 720 F.2d at 247; *Data General Corp. v. Grumman Systems Support Corp.*, 795 F.Supp. 501, 506 (D.Mass.1992); *Xerox Corp.*, 734 F.Supp. at 1550; *Nash*, 704 F.Supp. at 833; 1 Nimmer § 1.01[B][1][e] at 1–21 & n. 110. Here, Rubin contends that Brooks/Cole's credit line improperly represented that Rubin or the APA had sponsored or endorsed Forsyth's reproduction and use of the Love Scale. Thus, although somewhat factually dissimilar from boilerplate "passing off" claims in which the defendant pretends that the *product* is the plaintiff's, *e.g., Xerox*

---

**15.** The credit line reads in full at page 649 of the text:

(Table 7–4): From "Measurement of Romantic Love," by Z. Rubin. In *Journal of Personality*

*and Social Psychology*, 1970, 16, 265–273. Copyright 1970 by the American Psychological Association. Reprinted by permission.

*Corp.,* 734 F.Supp. at 1550; *see also* 1 Nimmer § 1.01[B][1][e] at 1–21 n. 110, Rubin's claim similarly contains an extra element of misrepresentation with regard to the sponsorship or authorization of the reproduction. *Cf. Warner Bros.,* 720 F.2d at 247. Accordingly, based upon the extra element of misrepresentation, the Court rules that Rubin's chapter 93A claim survives preemption based upon Brooks/Cole's representation that the Love Scale was reprinted with permission.

 Rubin also asserts that his chapter 93A claim survives preemption due to the backdated permission letters.[16] Although most actions taken by a publisher to obtain authors' permissions are likely to be so closely intertwined with a claim for impermissible reproduction as to be preempted (such as state law claims based upon failure to obtain permission at all or in a timely manner), the Court agrees that a claim based upon the backdating of permissions letters may indeed involve an "extra element" of deception sufficient qualitatively to differentiate the claim from one for copyright infringement. Therefore, although the Court questions whether these letters form an adequate basis on the merits for a claim by Rubin (as opposed to the recipient authors), the Court rules that Rubin's chapter 93A claim survives preemption to the extent that it is based directly upon the backdated letters.

In sum, the Court rules that Rubin's chapter 93A claim survives preemption to the extent that it is based upon Brooks/Cole's representation that the Love Scale was reprinted with permission and upon the backdated letters, but rules that the remainder of Rubin's chapter 93A claim is preempted. This said, and having exhausted all federal issues in the case, the Court declines to address the remaining portion of Rubin's chapter 93A claim on the merits, instead deferring such consideration to the expertise of the Massachusetts Superior Court.[17]

## CONCLUSION

On Count I, alleging copyright infringement as to past conduct, the Court finds in favor of the defendants on the basis that the use of the Love Scale was permissible fair use under 17 U.S.C. § 107. As to future conduct, the Court finds for Rubin and permanently enjoins Brooks/Cole and Wadsworth, their officers, employees, agents, and servants, and all persons acting in concert with either of them, from any further unauthorized publication or reprinting of the Love Scale.[18] On Count II, alleging unfair competition and unfair and deceptive business practices under Mass.Gen.L. ch. 93A, the Court finds the claim preempted in all respects except to the extent that it is based upon Brooks/Cole's representation that the Love Scale was reprinted with permission and upon the backdated letters. These remaining portions of Count II are remanded for further proceedings to the Massachusetts Superior Court sitting in and for the County of Suffolk.

**16.** For a description of these letters and the Court's relevant findings, see the Court's discussion of the first fair use factor and accompanying notes *supra.*

**17.** *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("[I]f the federal claims are dismissed before trial, ... the state claims should be dismissed as well."); *Vega v. Kodak Caribbean Ltd.,* 3 F.3d 476, 478 n. 2 (1st Cir.1993); *Gilbert v. City of Cambridge,* 932 F.2d 51, 67 (1st Cir. 1991) (similar), *cert. denied,* —— U.S.' ——, 112 S.Ct. 192, 116 L.Ed.2d 153 (1991).

**18.** This injunction does not prevent future sales of Forsyth's *Social Psychology* in its present edition to the extent such volumes have already been printed upon the date of this decision.