VERA LEE *vs*. MT. IVY PRESS, L.P., & others.[1]

No. 03-P-1496.

Middlesex. October 18, 2004. - May 17, 2005.

Present: CYPHER, KANTROWITZ, & BERRY, JJ.

*Copyright. Federal Preemption. Jurisdiction,* Federal preemption. *Contract,* Performance and breach, Interference with contractual relations, Unjust enrichment, Emotional distress. *Consumer Protection Act,* Unfair or deceptive act. *Fraud. Conversion. Emotional Distress. Damages,* Quantum meruit, Conversion. *Practice, Civil,* Substitution, Parties, Notice of appeal.

Discussion of Federal preemption of State law claims by § 301 of the Federal Copyright Act, 17 U.S.C. §§ 101 et seq. (1996). [546-549]

In a civil action arising from a publishing arrangement, alleging breach of contract, interference with contractual relations, fraud, violation of G. L. c. 93A, and unjust enrichment, and seeking to pierce the corporate veil to hold an individual defendant personally responsible as a general partner of the limited partnership defendant, the State law claims were not preempted by § 301 of the Federal Copyright Act, 17 U.S.C. §§ 101 et seq. (1996) (Act), where the breach of contract claim sought to enforce the plaintiffs' contractual rights rather than assert any rights equivalent to the exclusive rights provided by § 106 of the Act [550-552], where the fraud in the inducement claim [552-553] and the G. L. c. 93A claim [553] each had an extra element that was qualitatively different from the elements required to prove a copyright infringement claim, and where the conversion claims did not contain the elements necessary to invoke the jurisdiction of the Act [553-554].

In a civil action against a publisher, its general partner, a literary agency retained by the publisher, and several attorneys employed by the literary agency, alleging breach of contract, interference with contractual relations, fraud, violation of G. L. c. 93A, and unjust enrichment, where one plaintiff filed a separate suit against the literary agency, the attorneys, and other parties, and settled with the literary agency and the attorneys, assigning to the literary agency all of her claims against the publisher in exchange for a cash payment but reserving her rights against the general partner, substitution of the literary agency for the plaintiff as a party on appeal was neither

---

[1]Jane Daniel and Misha Levy Defonseca. Defonseca cross-claimed against Mt. Ivy Press, L.P. (Mt. Ivy), and Jane Daniel. Palmer & Dodge LLP and Publishers Group West, Inc. (literary agents retained by Mt. Ivy), were named as defendants in order to reach and apply any monies they received on behalf of Mt. Ivy.

necessary or appropriate within the meaning of Mass.R.A.P. 30(b), 365 Mass. 878 (1974), where there was no suggestion that the plaintiff was not fully capable of continuing with the appeal, and where, as the plaintiff had not made any assignment of her judgments against the general partner (who was held jointly and severally liable with the publisher on all of the plaintiff's claims), the plaintiff had not lost interest in the case. [554-558] This court concluded that the only issues preserved for appeal from a judgment in a civil action alleging breach of contract, interference with contractual relations, fraud, violation of G. L. c. 93A, and unjust enrichment were those from the denial of an individual defendant's motions for a new trial and to amend the judgment, as well as those in the individual defendant's and the limited partnership defendant's appeals from the G. L. c. 93A judgment [558-561]; further, this court concluded that the judge did not permit the trial to stray into forbidden consideration of copyright infringement claims [561], and that the judge's findings of fact with respect to the c. 93A claims were not clearly erroneous [561-562].

CIVIL ACTION commenced in the Superior Court Department on May 20, 1998.

The case was tried before *Elizabeth M. Fahey*, J., and post-judgment motions were heard by her.

*David J. Daly* (*Timothy J. Daly* with him) for Mt. Ivy Press, L.P., & another.

*Thomas J. Sartory* (*Gary M. Ronan* with him) for Palmer & Dodge LLP.

*Ramona J. Hamblin* for Misha Levy Defonseca.

*Frank J. Frisoli, Jr.*, for the plaintiff.

KANTROWITZ, J. Shortly after the Nazis seized her parents, seven year old Misha Levy[2] fled alone to the forests and villages of Europe, where she wandered for four years. Along the way, she witnessed atrocities, found herself trapped in the Warsaw Ghetto, and killed a Nazi soldier in self-defense. Miraculously, she survived her ordeal, thanks to her strong will and guile as well as, incredibly, the aid of a pack of wolves, who "adopted" and protected her, providing food, companionship, and affection.

Needless to say, her story was compelling. Fifty years later, she would sell it to Mt. Ivy Press, L.P. (Mt. Ivy), and its sole employee, Jane Daniel, who also convinced soon-to-be former friend Vera Lee to help write the book (or "Work"). Turning to

[2]Later known by her married name, Defonseca.

the final chapter of this sad legal tale, the actions of Daniel, her company, and her agent, Palmer & Dodge LLP, ultimately resulted in a judgment of $32.4 million against Daniel and Mt. Ivy, which forms the basis of this appeal.

*Facts.* Four decades after her ordeal, Defonseca immigrated to the United States, settling in a small town outside of Boston. Only occasionally did she speak about her wartime experiences. By chance, defendant Jane Daniel heard Defonseca speak at an event in New York in 1994 and immediately recognized the enormous earning potential of her story. Daniel was the founder of Mt. Ivy,[3] a small publishing company that was run out of the basement of her home. By misrepresenting to Defonseca that she possessed the experience and expertise to market the book, and by promising a first printing of over 50,000 copies, Daniel convinced Defonseca to write her life story. In fact, as Defonseca would painfully discover, Daniel's experience, expertise, and financing ability were all lacking.[4]

Because Defonseca was not a professional writer and English was not her first language, Daniel enlisted the help of her neighbor and friend of twenty years, Vera Lee, to work as a coauthor with Defonseca. Lee was a former professor at Boston College and an experienced author.[5] Perhaps most importantly,

---

[3]Daniel and her daughter, Liza Daniel Butler, formed Mt. Ivy as a limited partnership in 1993, funded solely by capital provided by Daniel. The partnership agreement identified the general partners as "Mt. Ivy Press, Inc.," (a Massachusetts corporation formed by Daniel and Butler in 1993 with Butler as the sole officer) and "Dara Associates, Inc.," a corporation apparently set up by Daniel's attorney, Brett Kates, for the sole purpose of being a general partner in Mt. Ivy Press, L.P. The partnership agreement also listed Daniel, her father James, and an entity called "MBK Partners" as limited partners. Although Butler, as sole officer and shareholder of Mt. Ivy Press, Inc., was named as a general partner of Mt. Ivy Press, L.P., the trial judge concluded, supported by Butler's own testimony, that she had little to do with the partnership's business decisions or management. Daniel was effectively the owner of Mt. Ivy Press, L.P., and its sole employee.

[4]Evidence revealed that Mt. Ivy never had the capital to print that large a number of books and that the company was only surviving through personal loans made to it by Daniel.

[5]Lee taught at Boston College for nineteen years, rising to the level of full professor of French and chairman of the Romance Languages department. During her time at Boston College, she was the recipient of several honors and grants including recognition from the French Ministries of Education and

Lee was fluent in French — Defonseca's native language. Despite her friendship with Daniel, Lee was reluctant to involve herself in the project, being aware of Daniel's prodigious history of litigation.[6] But Daniel overcame Lee's hesitation by touting the potential of the book to be a best seller and by promising that her name would be on the cover.

Mt. Ivy, through Daniel, signed separate publishing agreements with Lee and Defonseca in August, 1995. The agreements — virtually identical — granted Mt. Ivy exclusive rights to publish, distribute, reproduce, sell, and use the Work in exchange for royalty payments to Lee and Defonseca. Both agreements also required that Mt. Ivy would "take out and register copyright in the text in the name of the Author and her collaborator [i.e., Defonseca and Lee] in compliance with the United States copyright laws." If the Work was not delivered, or was "not accepted by the Publisher as being satisfactory for publication," the agreements provided that Mt. Ivy's sole remedy would be the option to terminate the agreements. Finally, the French translation rights in the Work were expressly reserved to Defonseca and Lee.

Lee and Defonseca, with Daniel's knowledge, separately executed a "Collaboration Agreement" providing that they would work together to complete the book, and that both would be given authorship credit on the final product. Lee and Defonseca worked diligently on the book for the next nine months, turning over several drafts to Daniel ahead of schedule, and submitting a third draft on May 15, 1996.

Daniel was becoming more sure of the book's enormous potential to become a best seller. The "buzz" concerning the book was generating a significant amount of interest from foreign publishers. In fact, in July, 1996, well ahead of the book's publication in English, Mt. Ivy sold the German rights, receiving a $135,000 advance.

Culture. Lee left to take a position as executive director of the French Library in Boston. She had also authored eleven fiction and nonfiction books and approximately twenty articles.

[6]A review of the Superior Court records indicates Daniel's involvement in eighteen different lawsuits.

Daniel began plotting to remove Lee from the project,[7] falsely complaining to Lee about the quality of the book and Lee's writing ability. Daniel had also begun rewriting the book even before she had received a final draft from Lee.[8] To facilitate her fraudulent efforts to obtain a personal interest in the book, Daniel executed a work-for-hire agreement with Mt. Ivy in October, 1996.[9] Neither Lee nor Defonseca knew about this agreement. The trial judge found that the work-for-hire agreement — essentially a contract between Daniel and herself — "was a scam orchestrated by Daniel solely to withhold monies lawfully owed by Mt. Ivy to Lee and Defonseca."

Daniel also drove a wedge between Lee and Defonseca so that, in the words of the trial judge, "it would be easier to defraud them." Daniel threatened to remove Lee's name from the book cover to coerce her into ending contact with Defonseca. Simultaneously, Daniel led Defonseca to believe that Lee was jeopardizing the project with her poor writing and by making herself unavailable to work.

Ultimately, in April, 1997, Mt. Ivy published Misha: A Memoire of the Holocaust Years, without Lee's name on the cover and in a form substantially different from what had been submitted to Daniel by Lee and Defonseca. In clear breach of the publishing agreements, as the jury found, Mt. Ivy also included its own name on the certificate of registration for the copyright.

Despite the personal friction that had developed, Daniel undertook her marketing obligations under the publishing agree-

[7]Daniel's motive for removing Lee seemed to have been based on the belief that having a coauthor's name on the cover would reduce Mt. Ivy's profits. She also wanted personally to gain a copyright interest in the work through her own rewrites.

[8]The publishing agreement granted Daniel the right to edit the Work, but on the condition that "the meaning of the text is not materially altered." Furthermore, Daniel was required to "solicit and consider [Defonseca's and Lee's] comments regarding such edits."

[9]The work-for-hire agreement provided, "The parties [Mt. Ivy and Daniel] agree that the resulting original material shall be considered a work for hire, performed by Jane as an employee of Mt. Ivy Press, and that the copyright for the resulting original material shall be held by Mt. Ivy Press, L.P. jointly with the other co-author(s). This work for hire agreement notwithstanding, compensation to Jane [Daniel] shall be equal to that earned by Misha Defonseca except for the French rights, in which compensation will be equal to that earned by Vera Lee."

ment and maintained responsibility for domestic marketing of the book.[10] Her efforts produced minimal results, however, and the book's sales in the United States were poor. In any event, Daniel eventually ceased her promotional efforts in 1997 in accordance with her over-all scheme to obtain all of the rights to Defonseca's story.

Daniel hired the Palmer & Dodge Agency (Palmer & Dodge),[11] which assigned attorneys Elaine Rogers and Sandra Missakian to handle the foreign marketing and marketing of the dramatic rights. Palmer & Dodge's efforts were more fruitful than Daniel's; the book became a best seller in several European nations, and Palmer & Dodge "pitched" the story to some one dozen movie companies.

However, in its zeal to market the book, Palmer & Dodge overstepped the bounds of its authority. Despite knowledge of the limitation in the publishing agreements reserving all French rights to Defonseca and Lee, Rogers and Missakian marketed the book to French publishers without Defonseca's or Lee's knowledge or consent.[12] Defonseca discovered the efforts when she was contacted independently by a French publisher, Édi-

---

[10]Daniel's marketing efforts included, among other things, hiring a publicist who arranged speaking engagements for Defonseca, and holding a press party in March, 1997, attracting attention from the Boston Globe, the Boston Herald, the Providence Journal, the Seattle Times, People Magazine, WBZ News, Chronicle, New England Cable News, and Fox News. Mt. Ivy also made arrangements for Defonseca to appear on the Oprah Winfrey show, which actually filmed a segment. The piece never aired, however, because Daniel herself canceled it.

[11]The Palmer & Dodge Agency was a service of the law firm of Palmer & Dodge LLP, which was named as a reach and apply defendant in Lee's complaint (see note 1, *supra*). While Palmer & Dodge did not defend the action, its attorneys testified on behalf of the firm throughout this litigation. In any event, the Palmer & Dodge Agency no longer exists, as the law firm Hill & Barlow purchased it in 2002, and several of the attorneys involved in this case (including Elaine Rogers, see text, *infra*) joined the now defunct Hill & Barlow. We shall refer to Palmer & Dodge LLP and the Palmer & Dodge Agency interchangeably as "Palmer & Dodge."

[12]Rogers testified that, although she knew that Palmer & Dodge was not authorized to represent the French rights, there was, in her view, an unresolved ambiguity in the publishing agreements about ownership of any French translation. Missakian also testified that she felt the clause dealing with the French rights was unclear. The judge found, however, that "[i]t was the practice and obligation of . . . Rogers . . . and . . . Missakian . . . to review underlying contracts to determine that the rights they were marketing actually

tions Robert Laffont, whereupon she promptly notified Rogers and Missakian of her rights under the publishing agreement with Mt. Ivy. After some discussion, Defonseca permitted the French contract to proceed, resulting in a publishing agreement between Defonseca, Lee, and Laffont on November 13, 1996 (First French Agreement).

Daniel was not personally involved in the First French Agreement, but quickly found out about it. Once she did, she informed Missakian of Mt. Ivy's alleged copyright interest in the Work, see note 9, *supra*, and insisted that Mt. Ivy be included in the contract. Missakian redrafted the contract (Second French Agreement) to include Mt. Ivy as a party, and, in February, 1997, resubmitted it to Defonseca for her signature, intentionally failing to inform her that Mt. Ivy had been added as a signatory, and thus would be entitled to a portion of the French rights, in violation of the original publishing agreement signed by Defonseca and Mt. Ivy. Instead, Missakian falsely represented to Defonseca that "the originals . . . were somehow lost en route to France," and that Defonseca had to sign the French agreement again.[13] After falsely obtaining Defonseca's signature on the Second French Agreement, Daniel then intimidated and threatened Lee, obtaining her signature also.[14]

In May, 1997, frustrated with the loss of authorship credit on the cover of the book as well as the escalating situation with

belonged to the client they were then representing." The judge therefore concluded that "Rogers and Missakian both knew, or at the very least should have known, that the French rights were excluded from the Publishing Agreement . . . ."

[13]The judge found that "Missakian intentionally failed to inform Defonseca of this material change to the French Publishing Agreement which, if Defonseca had known of, she would not have signed. Missakian's intent was to deceive and she did, in fact, deceive Misha Defonseca into signing this second French agreement." The evidence supports this conclusion, and Missakian's own testimony does not contradict it. We leave the propriety of this conduct, as well as the other actions by those involved, to the Board of Bar Overseers.

[14]Daniel had already pressured Lee into assigning Mt. Ivy one-half of Lee's share of the proceeds from any French translation. Although Daniel offered no consideration, upon demanding the assignment, she commented that "[i]t would be a shame if we sued each other." Lee gave in to the pressure. At the time, Lee had no legal representation, and, as the judge found, was fully aware that "[a]ll of Daniel's previous collaborative efforts [had] resulted in litigation."

Daniel, Lee sent demand letters threatening legal action to both Defonseca and Daniel. Defonseca urged Daniel to resolve the problem by putting Lee's name on all reprints. After Daniel refused, Defonseca notified Daniel that, should Lee sue her, Defonseca would seek indemnification from Mt. Ivy for any associated costs.

In August, 1997, shortly after receiving Defonseca's demand for indemnification, Daniel created an offshore subsidiary corporation called Mt. Ivy Press International, Ltd. (Mt. Ivy International). Concurrently, for consideration of one dollar, she executed an assignment to Mt. Ivy International of all Mt. Ivy Press, L.P.'s "right, title, and interest to publication of the [Work] outside the United States and Canada." The trial judge found that the actual purpose of creating Mt. Ivy International was to transfer all foreign rights to the book to the offshore company, and to avoid paying Defonseca and Lee royalties on the foreign publication of the book.[15] She further found that all of the money paid to Mt. Ivy International was eventually funneled to Daniel.

In May, 1998, Lee filed suit in Superior Court against Mt. Ivy, Daniel, and Defonseca, alleging breach of contract, interference with contractual relations, fraud, violation of G. L. c. 93A, quantum meruit, and unjust enrichment, and seeking to pierce the corporate veil and to hold Jane Daniel personally responsible as a general partner of Mt. Ivy. Palmer & Dodge and Publishers Group West, Inc., were also sued, as reach and apply defendants. Defonseca cross-claimed against Daniel and Mt. Ivy with similar claims, as well as conversion and the intentional infliction of emotional distress. Mt. Ivy and Daniel counterclaimed against Lee and cross-claimed against Defonseca for breach of contract, defamation, and trade disparagement. Additionally, interference with contractual relations and violation of G. L. c. 93A were alleged against Lee only.

In special verdicts, the jury pierced the corporate veil, found

[15]It appears that Brett Kates, chief counsel for Mt. Ivy, and instrumental in the establishment of Mt. Ivy and the other organizations associated with it, was primarily responsible for assisting Daniel in setting up Mt. Ivy International. It is unclear from the record what involvement, if any, Palmer & Dodge had in setting up the offshore account.

that Daniel had acted as a general partner of Mt. Ivy, and found against Daniel and Mt. Ivy on all of Lee's claims and Defonseca's cross claims. The jury rendered an advisory verdict in favor of Lee and Defonseca on their c. 93A claims against Mt. Ivy. A rule 54(b) judgment entered for Lee in the amount of $3.3 million and for Defonseca in the amount of $7.5 million against Mt. Ivy and Daniel.[16] See Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974). The judge also ordered restoration of the copyright on the book to Defonseca and Lee, as well as the dramatic, movie, television, and radio rights. On the c. 93A claims, the judge found for Lee and Defonseca, and trebled the damages. Mt. Ivy and Daniel were held jointly and severally liable for $9.9 million to Lee and $22.5 million to Defonseca.[17,18]

*Discussion.* The issues presented in this case are complex and convoluted. We begin by deciding whether Federal copyright law preempts the claims brought here, thus robbing us of subject matter jurisdiction. If we, in fact, have jurisdiction, we must then rule on (1) a motion filed by Daniel and Mt. Ivy (collectively, "the defendants") to substitute Palmer & Dodge for Defonseca as the real party in interest in relation to the appeal from Defonseca's judgment against Mt. Ivy; (2) the scope of our review, as it is evident that the defendants erred procedurally in filing some of their notices of appeal; and, finally, (3) the merits of the substantive issues preserved on appeal.

*Preemption.* The mainstay of the defendants' appeal is their contention that the State law claims "or parts thereof" asserted by Lee and Defonseca (collectively, "the plaintiffs") were preempted by § 301(a) of the Federal Copyright Act (Act), 17 U.S.C. §§ 101 et seq. (1996). If the State claims were preempted, the Superior Court lacked subject matter jurisdiction

---

[16]The jury also awarded Lee damages in the amount of one dollar on her breach of contract claim against Defonseca. Mt. Ivy and Daniel were not successful in any of their claims.

[17]To avoid awarding duplicative damages, the judge limited recovery to the c. 93A claims.

[18]In April, 1999, Defonseca filed a copyright infringement action against Mt. Ivy in the Federal District Court. That action was stayed pending the outcome of the instant matter and was subsequently dismissed without prejudice in 2002.

to hear them, and any judgment rendered with respect to them would be void. See *ROPT Ltd. Partnership* v. *Katin*, 431 Mass. 601, 605 (2000).

Before turning to the merits of these contentions, however, we pause to express our concern with the defendants' position. During the pretrial proceedings, Daniel and Mt. Ivy filed a motion in limine to preclude the introduction of any evidence of copyright infringement. The judge allowed the motion, and the trial proceeded without any objection from the parties as to the evidence admitted or the claims presented. Daniel and Mt. Ivy thus took the position that this was not a copyright infringement case. Only after losing at trial do they now protest, arguing that the trial court never had jurisdiction. As we have stated previously, "It defies logic and fundamental principles of fairness to allow a represented party who has sought justice in a forum to contradict and undermine an agreement it reached and acknowledged in that same forum, especially when the judge and other litigants appear to have relied on that acknowledgement." *Correia* v. *DeSimone*, 34 Mass. App. Ct. 601, 604 (1993).

Although one might wish to analyze this issue under the lens of judicial estoppel,[19] we are constrained not to, given the claim the court lacked subject matter jurisdiction.[20] See *McCracken* v. *Sears, Roebuck & Co.*, 51 Mass. App. Ct. 184, 188 (2001).

---

[19]Judicial estoppel, an equitable principle recognized in Massachusetts, see *Paixao* v. *Paixao*, 429 Mass. 307, 309-311 (1999); *Otis* v. *Arbella Mut. Ins. Co.*, 443 Mass. 634, 639-642 (2005), "precludes a party from asserting a position in one legal proceeding which is contrary to a position it has already asserted in another." *Lydon* v. *Boston Sand & Gravel Co.*, 175 F.3d 6, 12 (1st Cir. 1999), quoting from *Patriot Cinemas, Inc.* v. *General Cinema Corp.*, 834 F.2d 208, 212 (1st Cir. 1987).

[20]While we are not unsympathetic to the plaintiffs' waiver argument, it is not supported by authority. Equitable defenses such as waiver and estoppel typically are not available when subject matter jurisdiction is at issue. See *Mc-Cracken* v. *Sears, Roebuck & Co.*, 51 Mass. App. Ct. 184, 188 (2001). Although there is some authority supporting the general proposition that the affirmative defense of preemption may be waived if the Federal statute at issue controls only the substantive law that applies rather than the forum in which the matter must be adjudicated, see *Central Transp., Inc.* v. *Package Printing Co.*, 429 Mass. 189, 191-193 (1999), waiver is inappropriate in the matter before us. Here, Congress has given the Federal courts exclusive jurisdiction to hear and decide copyright infringement cases. See 28 U.S.C. § 1338(a) (1993). Since Federal law controls both choice of law, see § 301 of

Compare *Lydon* v. *Boston Sand & Gravel Co.*, 175 F.3d 6, 13-14 (1st Cir. 1999).

Federal law grants exclusive jurisdiction to the Federal courts over all copyright infringement claims, as well as those that are deemed "equivalent" to copyright infringement claims. See 17 U.S.C. § 301(a); 28 U.S.C. § 1338(a) (1993). See also *Firoozye* v. *Earthlink Network*, 153 F. Supp. 2d 1115, 1122 (N.D. Cal. 2001). Such "equivalent" claims are deemed preempted under § 301 of the Act, thus eliminating jurisdiction of the State courts.[21] See 28 U.S.C. § 1338(a).

The courts have developed a two-pronged test to establish whether a particular State claim is preempted. See *Rubin* v. *Brooks/Cole Publishing Co.*, 836 F. Supp. 909, 922-923 (D. Mass. 1993). First, the work in which rights are claimed must come within the subject matter of copyright as defined by the Act. See 17 U.S.C. §§ 102, 301(a). In the instant matter, there is no dispute that the first prong of the test is satisfied.[22]

The second prong requires that, in order for a claim to be preempted, the legal or equitable right asserted under State law must be equivalent to one or more of the "exclusive rights" provided by § 106 of the Act.[23] See 17 U.S.C. § 301(a); *Rubin* v. *Brooks/Cole Publishing Co.*, 836 F. Supp. at 923.

the Act (the preemption provision), and choice of forum, see 28 U.S.C. § 1338(a), State courts have no jurisdiction to decide copyright infringement claims. The issue of preemption, therefore, cannot be waived.

[21]Section 301 of the Act provides that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright . . . are governed exclusively by this title." 17 U.S.C. § 301(a).

[22]Section 102(a) of the Act provides: "Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories: (1) literary works . . . ." 17 U.S.C. § 102(a).

[23]Under § 106 of the Act, a copyright owner has "the exclusive rights to do and to authorize any of the following: . . . to reproduce the copyrighted work . . . to prepare derivative works . . . to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending . . . to perform the copyrighted work publicly . . . [and] to display the copyrighted work publicly." 17 U.S.C. § 106(1)-(5). States remain free to regulate any activities that may violate nonequivalent rights. See 17 U.S.C. § 301(b)(3); *Commonwealth* v. *Yourawski*, 384 Mass. 386, 389 n.4 (1981).

Although the language of § 301(a) (see note 21, *supra*) may seem clear, many courts have struggled with the meaning of the equivalency requirement.[24] To assess the equivalency of State and Federal claims, the Federal courts have developed what is known as the "extra element" test. See *Rubin* v. *Brooks/Cole Publishing Co.*, *supra* at 923. Simply stated, "[W]hen a right defined by state law may be abridged by an action which, in and of itself, would infringe one of the exclusive rights . . . , the state law in question must be deemed preempted. Conversely, when a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur." *Ibid.*, quoting from *Harper & Row, Publishers, Inc.* v. *Nation Enterprises*, 723 F.2d 195, 200 (2d Cir. 1983), rev'd on other grounds, 471 U.S. 539 (1985).

The extra element inquiry is not accomplished merely by counting the elements of a claim. The fact that a State claim has more elements than a Federal claim will not necessarily save it from preemption. See *Data Gen. Corp.* v. *Grumman Sys. Support Corp.*, 36 F.3d 1147, 1164-1165 (1st Cir. 1994). Rather, the dispositive factor is the nature of the claim asserted. Where the extra element renders the claim "qualitatively different" from a Federal copyright claim, the State cause of action will survive a preemption challenge. See *Rubin* v. *Brooks/Cole Publishing Co.*, 836 F. Supp. at 923; *Henry* v. *National Geographic Soc.*, 147 F. Supp. 2d 16, 20 (D. Mass. 2001). In determining whether a State law claim is qualitatively different from a copyright claim, courts look beyond the label and evaluate what right the plaintiff was seeking to protect or enforce and the theories on which the claim was brought. See *Patricia Kennedy & Co.* v. *Zam-Cul Enterprises, Inc.*, 830 F. Supp. 53, 56 (D. Mass. 1993).

---

[24]The United States House of Representatives Report on the latest revision of the Act declared that its intent was to set forth the principles of § 301 "in the clearest and most unequivocal language possible, so as to foreclose any conceivable misinterpretation . . . and to avoid the development of any vague borderline areas between State and Federal protection." H.R. Rep. No. 1476, 94th Cong., 2d Sess. 130 (1976). Given the significant amount of jurisprudence in this area, one may question whether the goal has been achieved. See 1 Nimmer, Copyright § 1.01[B], at 1-9 — 1-10 (2004).

Applying these principles, we conclude that the State claims of Lee and Defonseca were not preempted by the Act.[25]

a. *Breach of contract.* We turn first to the breach of contract claims. In general, private contract disputes belong in State court. See H.R. Rep. No. 1476, 94th Cong., 2d Sess. 132 (1976) ("[n]othing in the bill derogates from the rights of parties to contract with each other and to sue for breaches of contract"); *T.B. Harms Co.* v. *Eliscu,* 339 F.2d 823, 826 (2d Cir. 1964), cert. denied, 381 U.S. 915 (1965) ("the federal grant of a patent or copyright has not been thought to infuse with any national interest a dispute as to ownership or contractual enforcement turning on the facts or on ordinary principles of contract law"); *Royal* v. *Leading Edge Prods., Inc.,* 833 F.2d 1, 2 (1st Cir. 1987) ("action does not 'arise under' the federal copyright laws merely because it relates to a [work] that is the subject of a copyright"); *Baptiste* v. *Khoury,* 910 F. Supp. 277, 279 (W.D. La. 1996) (noting that "Federal courts have jurisdiction of suits for infringement of a copyright outside of the contractual context"; concluding that claim that defendant surreptitiously added himself to publishing agreement without author's knowledge belonged in State court). See also *LaChapelle* v. *United Shoe Mach. Corp.,* 272 Mass. 465, 471-472 (1930) (State

---

[25]The judge and jury found in favor of Lee and Defonseca on all of the legal claims, factual issues, and theories of recovery they had submitted for disposition. On appeal, there is confusion concerning the scope of the defendants' preemption claims. Daniel and Mt. Ivy broadly assert in their joint brief that all claims were either preempted by the Act, or, even if not preempted, were sufficiently compromised by the improper presence of copyright infringement claims. A preemption challenge, however, calls for a claim-by-claim analysis and an examination of the theories underpinning each claim. See *Firoozye* v. *Earthlink Network,* 153 F. Supp. 2d at 1126. Here, at most, the defendants have offered a conflated analysis of only four claims (breach of contract, fraud in the inducement, conversion, and G. L. c. 93A). We limit our discussion to those claims. See *Quincy Cablesys., Inc.* v. *Sully's Bar, Inc.,* 650 F. Supp. 838, 850 n.6 (D. Mass. 1986) (court refused to reach particular preemption claim because parties failed to adequately address it). Cf. *Hearn* v. *Massachusetts Bay Transp. Authy.,* 389 Mass. 404, 405-406 n.3 (1983) (passing reference to issue in brief is not argument contemplated by Mass.R.A.P. 16[a][4], as amended, 367 Mass. 921 [1975]); *Budish* v. *Daniel,* 417 Mass. 574, 577 n.5 (1994) (argument waived because not raised below and not briefed on appeal). Nonetheless, in reviewing the other, sparsely-alluded-to claims, we conclude that none of them were preempted.

courts may try questions of title and construe and enforce contracts relating to intellectual property).

In the majority of cases we have examined, courts have found that, because claims of breach of contract involved breach of a promise, an extra element not required to prove a copyright infringement claim, they were not preempted by Federal copyright law. See 1 Nimmer, Copyright § 1.01[B][1][a], at 1-15 (2004); *A. Brod, Inc.* v. *SK&I Co.*, 998 F. Supp. 314, 323 (S.D.N.Y. 1998); *Torah Soft Ltd.* v. *Drosnin*, 224 F. Supp. 2d 704, 716-717 (S.D.N.Y. 2002). Nonetheless, a breach of contract claim based solely upon a promise to refrain from taking one of the actions reserved exclusively to the copyright owner should be struck on preemption grounds. See 1 Nimmer, Copyright § 1.01[B][1][a], at 1-22; *Wrench LLC* v. *Taco Bell Corp.*, 256 F.3d 446, 457-458 (6th Cir. 2001), cert. denied, 534 U.S. 1114 (2002).

In this case, the rights Lee and Defonseca sought to enforce — contractual obligations freely negotiated and agreed to by the parties — were qualitatively different from the exclusive rights provided by § 106 of the Act. See *Asunto* v. *Shoup*, 132 F. Supp. 2d 445, 452 (E.D. La. 2000).

Lee alleged that Mt. Ivy breached the parties' publishing agreement by (1) exceeding the editorial authority granted to Mt. Ivy by materially altering the meaning of the text over Lee's objection; (2) violating the sole remedy provision (which limited Mt. Ivy's remedy to termination of the agreement in the event Lee's work was delivered in an untimely fashion or in a condition not satisfactory for publication); (3) failing to indemnify Lee; (4) failing to give Lee the right to approve the title and cover design; (5) failing to provide Lee with a galley proof of the work for approval prior to publication; (6) failing to give Lee the appropriate authorship credit; and (7) failing to pay royalties and to provide accountings.

Defonseca alleged that Mt. Ivy materially breached the publishing agreement with her by (1) failing to provide reasonably prompt feedback on the manuscript; (2) fraudulently obtaining copyright registration in the name of Mt. Ivy; (3) failing to adequately market, publicize, and promote the book; (4) fraudulently pursuing the sale of the French translation

rights, which were specifically excluded from the contract; (5) failing to pay royalties; (6) failing to provide timely and accurate accountings; and (7) refusing to give Lee proper authorship credit.

None of these alleged breaches involved the unauthorized publication or distribution of the Work (or other exclusive rights of copyright). See § 106 of the Act (note 23, *supra*). Indeed, a theory of breach grounded in § 106 would make little sense because Lee and Defonseca had granted these exclusive rights to Mt. Ivy as part of their publishing agreements.[26] Thus, because Lee and Defonseca sought to enforce their contractual rights rather than assert any rights equivalent to the exclusive rights provided by § 106 of the Act, their breach of contract claims were not preempted.[27] See *Henry* v. *National Geographic Soc.*, 147 F. Supp. 2d at 21.

b. *Fraud in the inducement.* We further hold that the plaintiffs' fraud in the inducement claims were not preempted.[28] See 1 Nimmer, Copyright § 1.01[B][1][e], at 1-29 ("element of misrepresentation or deception . . . is no part of a cause of action for copyright infringement"); *Valente-Kritzer Video* v. *Pinckney*, 881 F.2d 772, 776 (9th Cir. 1989), cert. denied, 493 U.S. 1062 (1990) (due to element of misrepresentation, common-law fraud claim was not preempted). See also *Firoozye* v. *Earthlink Network*, 153 F. Supp. 2d at 1129 (misrepresenta-

---

[26]In exchange for the payment of royalties, both Lee and Defonseca in the publishing agreements granted to Mt. Ivy and its licensees a number of "primary" and "secondary" rights in the Work. The primary rights in the Work included the "exclusive right to publish, distribute, reproduce, sell, and use . . . the Work."

[27]Defonseca's claim concerning the fraudulent marketing of the French translation rights was not a veiled copyright infringement claim. Rather, the gravamen of the claim was that Mt. Ivy's agent fraudulently held itself out as having authority to market the French translation rights, when in fact such authority was explicitly excluded in the publishing agreements. Such a claim has the "extra element" required to survive a preemption challenge. See, e.g., our discussion of fraud in the inducement and G. L. c. 93A, *infra*.

[28]The jury found that Daniel had fraudulently induced Defonseca into signing the publishing agreement by making false statements regarding Mt. Ivy's experience, achievements, and credibility in the publishing industry. On Lee's complaint, the jury found that Mt. Ivy and Daniel had fraudulently induced Lee into assigning half of her French rights to Mt. Ivy.

tion claims require additional element — proof of "a false statement to the plaintiff with the intent to induce reliance").

c. *General Laws c. 93A.* To the extent that the plaintiffs' G. L. c. 93A claims were based upon the same fraudulent conduct, see note 28, *supra* (and additional unfair acts, deception and misrepresentation), the claims were qualitatively different from a copyright infringement claim, and thus were not preempted. See *Patricia Kennedy & Co. v. Zam-Cul Enterprises, Inc.,* 830 F. Supp. at 57 (G. L. c. 93A claim based on false assertion of authorship was not preempted); *Rubin v. Brooks/Cole Publishing Co.,* 836 F. Supp. at 923-925 (G. L. c. 93A claims predicated upon acts of misrepresentation and deception were not preempted).

d. *Conversion.* The jury found for Defonseca on two separate conversion claims. The first claim sought damages for the conversion of royalties owed to Defonseca under the publishing agreement. This claim clearly was not preempted by the Act. See *Dead Kennedys v. Biafra,* 37 F. Supp. 2d 1151, 1154 (N.D. Cal. 1999) (action alleging conversion of royalties was not preempted); *Asunto v. Shoup,* 132 F. Supp. 2d at 452.

Neither was the second claim — that the copyright interest itself was converted — preempted.[29] The factual underpinnings for the second claim were that Daniel wrongfully added Mt. Ivy's name to the copyright registration in violation of the publishing agreement, and that Mt. Ivy and Daniel then wrongfully exercised dominion and control over the copyright by, e.g., withholding approval for a French sublicense to translate and publish the book, when the French rights had been explicitly reserved to Defonseca and Lee in the publishing agreement. These actions fall short of the element of "copying" necessary to invoke the jurisdiction of the Federal courts under the Act. See *G.S. Rasmussen & Assocs. v. Kalitta Flying Serv., Inc.,* 958 F.2d 896, 904 (9th Cir. 1992), cert. denied, 508 U.S. 959 (1993) ("Federal copyright law governs only copying"); *Rokus v.*

---

[29]We do not reach the argument alluded to in the defendants' brief that conversion claims may only be brought in connection with tangible property. The sole issue properly preserved for appeal regarding conversion of the copyright is the defendants' argument that the claim is preempted by the Act, not that the claim itself lacks validity.

*American Bdcst. Co.,* 616 F. Supp. 110, 112 (S.D.N.Y. 1984). See also *A. Brod, Inc.* v. *SK&I Co.,* 998 F. Supp. at 323 n.5 ("[C]opyright ownership itself is not an exclusive right under § 106 [of the Act]. That section . . . applies only after a valid copyright owner has been determined. . . . In contrast, the prior question of ownership may depend on the application of state law contract . . . principles . . ."). The second conversion claim, therefore, is not preempted. Compare *Southern Music Publishing Co.* v. *C&C Films, Inc.,* 171 F. Supp. 832, 833 (S.D. N.Y. 1959) (allegation that defendant had " 'represented and asserted' that it ha[d] the right to use and authorize the use of plaintiff's song" could form basis for various common-law tort claims, but failed to state claim under Act); *Peay* v. *Morton,* 571 F. Supp. 108, 114 (M.D. Tenn. 1983) (no Federal jurisdiction under Act where sole act of copyright infringement alleged was that, "representing themselves as owners of all rights in [a] song, 'defendants authorized [various third parties] to record a performance of the composition . . . and to manufacture and release . . . records and tapes embodying the performance"). Contrast *Harper & Row, Publishers, Inc.* v. *Nation Enterprises,* 723 F.2d 195, 200-201 (2d Cir. 1983), rev'd on other grounds, 471 U.S. 539 (1985) (to extent that plaintiffs' conversion claim was grounded in allegation of unauthorized publication, it was preempted); *Murray Hill Publications, Inc.* v. *ABC Communications, Inc.,* 264 F.3d 622, 637 (6th Cir. 2001) (plaintiffs' conversion claim preempted where court held it was equivalent to claim that defendant "took their works and reproduced them, distributed them, publicly performed and displayed them, and made derivative works from them"). Cf. *Ehat* v. *Tanner,* 780 F.2d 876, 878 (10th Cir. 1985), cert. denied, 479 U.S. 820 (1986) (State law claim alleging damages resulting from reproduction of scholarly material was preempted by Act).

*Motion to substitute.* In January, 2002, Defonseca filed a separate action against Palmer & Dodge and several other parties[30] in Superior Court. Defonseca's claims included breach of

---

[30]The other parties included former Palmer & Dodge attorney Sandra Missakian, and attorneys John Taylor Williams and Elaine Rogers, still with Palmer & Dodge at the time suit was filed. Also named as defendants were

contract, breach of the implied covenant of good faith and fair dealing, violation of G. L. c. 93A, intentional interference with contractual relations, fraud, negligence, civil conspiracy, and legal malpractice.[31] Several of the parties settled in July, 2003, and Defonseca stipulated to a dismissal of Palmer & Dodge, John Taylor Williams (an attorney with Palmer & Dodge), Rogers, and Missakian.[32] Pursuant to the settlement agreement, Defonseca assigned to Palmer & Dodge "all of her claims of every kind and nature and any and all judgments she has or may obtain against Mt. Ivy Press, L.P.," in exchange for a cash payment.[33] Defonseca reserved her right to judgment against Daniel.

During the pendency of the instant appeal, Daniel and Mt. Ivy, citing the settlement agreement and Mass.R.A.P. 30(b), 365 Mass. 878 (1974), filed a motion to substitute Palmer & Dodge for Defonseca as to her judgments against Mt. Ivy. The issue presented is whether substitution is necessary within the meaning of rule 30(b) based upon Defonseca's assignment of her claims and judgments against Mt. Ivy to Palmer & Dodge.[34]

Rule 30 of the Massachusetts Rules of Appellate Procedure

American Program Bureau, Inc., the agency hired by Daniel to arrange speaking engagements for Defonseca, and Shirley Sandler, a publicist hired by Daniel to create promotional opportunities for Defonseca.

[31]At various times during the course of dealings among Lee, Defonseca, and Mt. Ivy, Palmer & Dodge served as the literary agent for one or more of the parties. Shortly after the commencement of Lee's suit in May, 1998, Palmer & Dodge terminated its agency agreement with all three parties.

[32]The remaining parties, American Program Bureau, Inc., and Shirley Sandler, did not settle. That litigation appears to have been dismissed on January 19, 2005, for failure to prosecute.

[33]Palmer & Dodge thus holds the judgment Defonseca won against Mt. Ivy. The propriety of assuming a huge judgment against Mt. Ivy, its former client, awarded in part because of the eyebrow-raising actions of Palmer & Dodge while representing Mt. Ivy, is not before us. We were informed at oral argument that Palmer & Dodge does not plan to move on the judgment, but would use it defensively, if sued, a happenstance which has come to fruition. Daniel and Mt. Ivy brought suit against Palmer & Dodge and its attorneys, Rogers and Williams, on June 10, 2004, in Superior Court.

[34]Rule 30(b) of the Massachusetts Rules of Appellate Procedure provides: "If substitution of a party in the appellate court is necessary for any reason other than death, substitution shall be effected in accordance with the procedure prescribed in subdivision (a)."

governs the substitution of parties at the appellate level.[35] No Massachusetts appellate court has interpreted the language of this rule. "[A]bsent compelling reasons to the contrary or significant differences in content," the Massachusetts Rules of Appellate Procedure should be construed in conformity with their Federal counterparts. *Doe* v. *Sex Offender Registry Bd.*, 429 Mass. 654, 655-656 (1999), quoting from *Vyskocil* v. *Vyskocil*, 376 Mass. 137, 139 (1978). See Reporter's Notes to Mass. R.A.P. 30, Mass. Ann. Laws Court Rules, Rules of Appellate Procedure, at 114 (LexisNexis 2004) (noting that Mass.R.A.P. 30 is based upon F.R.A.P. 43).[36]

A ruling on a motion to substitute brought under F.R.A.P. 43(b) rests in the sound discretion of the appellate court. See *Fred Harvey, Inc.* v. *Mooney*, 526 F.2d 608, 611 (7th Cir. 1975), citing *McComb* v. *Row River Lumber Co.*, 177 F.2d 129, 130 (9th Cir. 1949). Compare *Williams* v. *Ely*, 423 Mass. 467, 478 (1996) (review of ruling on motion brought under Mass.R.Civ.P. 25[c] is for abuse of discretion).

In exercising their discretion, the Federal courts have interpreted F.R.A.P. 43(b) narrowly, permitting substitution only in limited situations. See *Alabama Power Co.* v. *Interstate Commerce Commn.*, 852 F.2d 1361, 1366 (D.C. Cir. 1988). Substitution is considered necessary under F.R.A.P. 43(b) if the party to be removed from the case is "incapable of continuing with the litigation," *Maier* v. *Lucent Technologies, Inc.*, 120 F.3d 730, 732 n.1 (7th Cir. 1997), "as where a party becomes incompetent

---

[35]Rule 30 provides for substitution in the event of death, "other causes," and separation from public office. See Mass.R.A.P. 30(a)-(c). Rule 25(c) of the Massachusetts Rules of Civil Procedure, 365 Mass. 771 (1974), governs substitution where a transfer of interest occurs "during the pendency of an action." Smith & Zobel, Rules Practice § 25.4, at 188 (1975); *Williams* v. *Ely*, 423 Mass. 467, 478 (1996). More specific than Mass.R.A.P. 30, Mass.R.Civ.P. 25 permits substitution upon four events: death, incompetency, a transfer of interest, and the separation of a party from public office. See Mass.R.Civ.P. 25(a)-(d). Given their identity of subject matter and similarity in language, rule 25 and Mass.R.A.P. 30 should be read in concert. See Reporter's Notes to Mass.R.A.P. 30, Mass. Ann. Laws Court Rules, Rules of Appellate Procedure, at 114 (LexisNexis 2004), cross-referencing Mass.R.Civ.P. 25.

[36]The Federal analogue to Mass.R.A.P. 30(b), F.R.A.P. 43(b), provides: "If a party needs to be substituted for any reason other than death, the procedure prescribed in Rule 43(a) applies." Massachusetts Rules of Court (Federal), at 185 (West 2005).

or a transfer of interest in the company or property involved in the suit has occurred." *Alabama Power Co.* v. *Interstate Commerce Commn.*, 852 F.2d at 1366. See, e.g., *Fred Harvey, Inc.* v. *Mooney*, 526 F.2d at 610-611 (landlord substituted for tenant on appeal where lease had ended and property rights had reverted to owner); *Beghin-Say Intl. Inc.* v. *Rasmussen*, 733 F.2d 1568, 1569 (Fed. Cir. 1984) (subsidiary substituted for parent company as appellant where parent company assigned patents at issue to subsidiary); *Fidelity & Guar. Ins. Underwriters, Inc.* v. *Everett I. Brown Co.*, 25 F.3d 484, 485 n.3 (7th Cir. 1994) (joint motion to substitute was allowed where only insurance policy involved in appeal was issued by original plaintiff's wholly-owned subsidiary).

Here, we conclude that substitution is neither necessary nor appropriate. There is no suggestion that Defonseca is not fully capable of continuing with this appeal. Moreover, as Defonseca made no assignment of her judgments against Daniel individually, and Daniel was held jointly and severally liable with Mt. Ivy on all of Defonseca's claims, Defonseca has not lost interest in the case. Compare *Alabama Power Co.* v. *Interstate Commerce Commn.*, 852 F.2d at 1366 (denying nonparty's motion to substitute where original appellants were fully capable of proceeding, but had voluntarily dropped their appeal). We note also that, although technically Defonseca no longer holds any interest in her claims and judgments against Mt. Ivy, Palmer & Dodge (the assignee of those interests) objects to the proposed substitution.[37] Under the circumstances, we think it unnecessary to replace Defonseca in any aspect of the case at this late stage of the proceedings. Moreover, substitution would serve no useful purpose. As the assignee of Defonseca's judgments against Mt. Ivy, Palmer & Dodge will be bound by the result of this appeal without any further action being taken. See 7C Wright, Miller, & Kane, Federal Practice and Procedure § 1958, at 555 (2d ed. 1986); *Williams* v. *Ely*, 423 Mass. at 478. Even if we were to substitute Palmer & Dodge for Defonseca, and Palmer & Dodge declined to defend the judgments, see note 37, *supra*,

---

[37]In papers submitted to this court responding to the defendants' motion to substitute, Palmer & Dodge argued against its being substituted for Defonseca in the appeal, noting, in part, that it had no interest in defending the appeal.

Mt. Ivy would not thereby be entitled to the automatic vacation of the judgments, as Daniel and Mt. Ivy contend. See Mass. R.A.P. 19(c), 365 Mass. 868 (1974); *Citibank* v. *Grupo Cupey, Inc.*, 382 F.3d 29, 32 (1st Cir. 2004), quoting from 6 Moore's Federal Practice par. 25.32 (3d ed. 2004) ("[r]ule 25[c] is merely a procedural device designed to facilitate the conduct of the case, and does not alter the substantive rights of the parties or the transferee"). Regardless, Daniel and Mt. Ivy will ultimately suffer no prejudice from the denial of the motion.

Because we conclude that substitution is not necessary as contemplated by Mass.R.A.P. 30(b), in the exercise of our discretion, the motion to substitute is denied.[38]

*Scope of review.* Given the nature of this case, it comes as no surprise that the simple act of filing a notice of appeal has become irreparably compromised. Postjudgment, Daniel and Mt. Ivy filed a multitude of notices of appeal, many of which appear to be defective, thus requiring that we determine what appellate issues are appropriately before us. Cutting to the chase, the only substantive issues we will consider are those preserved in Daniel's appeal from the denial of her motions for a new trial and to amend the judgment and those in Daniel's and Mt. Ivy's appeals from the c. 93A judgment.

We begin with a short recitation of the procedural history of this case. Judgment on the jury verdict was entered on August 23, 2001. See Mass.R.Civ.P. 54(b). On August 31, 2001, counsel for Mt. Ivy and Daniel timely filed a joint motion for a new trial, see Mass.R.Civ.P. 59(b), 365 Mass. 827 (1974), thus suspending the time for taking an appeal from the judgment until the entry of an order on that motion. See Mass.R.A.P. 4(a), as amended, 393 Mass. 1239 (1985); *Arthur D. Little, Inc.* v. *East Cambridge Sav. Bank*, 35 Mass. App. Ct. 734, 742-743 & n.7 (1994).

On October 11, 2001, while the motion for new trial was

_____

[38]The motion to substitute also incorporated a motion to strike any portions of Defonseca's brief associated with her judgments against Mt. Ivy. Given the relationship between Daniel and Mt. Ivy, it would be impractical, if not impossible, to separate, for purposes of the motion to strike, factual references and arguments concerning Daniel from those related to Mt. Ivy. Therefore, that motion is also denied.

pending, Daniel, now without counsel,[39] filed a joint motion to amend the judgment on the jury verdict on behalf of herself and Mt. Ivy. See Mass.R.Civ.P. 59(e), 365 Mass. 828 (1974). On October 22, 2001, the judge entered orders denying the joint motion for a new trial and the joint motion to amend.

On November 7, 2001, Daniel, proceeding pro se, filed a timely notice of appeal from the orders denying the two motions. On November 16, 2001, still proceeding without counsel, Daniel also filed a timely notice of appeal from the same orders on behalf of Mt. Ivy. Defonseca moved to strike Mt. Ivy's appeal from the orders; her motion was allowed on January 4, 2002, on the ground that Mt. Ivy, a limited partnership, could not be represented by Daniel, who is not an attorney. See note 39, *supra*. On February 4, 2002, now represented by counsel, Daniel and Mt. Ivy timely docketed notices of appeal from the order allowing Defonseca's motion to strike.

Successor counsel for Daniel and Mt. Ivy did not file notices of appeal from the judgment on the jury verdict until January 7, 2002 — nearly two and one-half months after entry of the October 22, 2001, orders denying the motions for a new trial and to amend the judgment. On April 17, 2002, a judgment on the c. 93A claims entered, from which Mt. Ivy and Daniel, now both represented by counsel, entered timely notices of appeal.

Daniel and Mt. Ivy argue that the scope of our review should include their substantive appellate arguments as to the alleged errors in the jury instructions as well as the denial of their motions for directed verdicts. There is no question that the January 7, 2002, notices of appeal from the underlying judgment, which would have brought these matters before us, were untimely.[40] Daniel and Mt. Ivy do not argue otherwise. Instead, they contend that appellate review of these issues may be predicated upon the timely November 7 and 16, 2001, notices of appeal from the denial of their postjudgment motions. We disagree.

[39]On October 5, 2001, the trial judge allowed Mt. Ivy's and Daniel's attorneys to withdraw. The judge also pointedly warned Daniel on at least two occasions that, as a nonattorney, she could not represent Mt. Ivy's interests.

[40]Pursuant to Mass.R.A.P. 4(a), the defendants had thirty days from October 22, 2001, the date the orders entered denying the motions for a new trial and to amend the judgment, to file notices of appeal from the judgment on the jury verdict.

a. *Daniel's representation of Mt. Ivy.* As noted above, Mt. Ivy's November 16, 2001, notice of appeal was struck because Daniel, a nonattorney, was not competent to file it on behalf of Mt. Ivy. See, e.g., *Varney Enterprises, Inc.* v. *WMF, Inc.*, 402 Mass. 79, 81-82 (1988). On appeal, Mt. Ivy devotes one paragraph of its sixty-five page brief, with no citation to authority, to its assertion that the trial judge erred in striking the November 16 notice of appeal. Such an argument does not meet the standards of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). See *McCone* v. *New England Tel. & Tel. Co.*, 393 Mass. 231, 236 (1984), and cases cited.[41] Given these considerations, and in light of the result we reach regarding the similar appellate arguments made by Daniel as to the conduct of the jury trial and the jury's verdict, see discussion, *infra*, we decline to consider Mt. Ivy's arguments concerning the judge's decision to strike the November 16 notice of appeal. As such, we confine our consideration of Mt. Ivy's substantive appellate arguments to the G. L. c. 93A issues.

b. *Daniel's appeal from the judgment on the jury verdict.* Returning to Daniel, her notice of appeal from the denials of her motion for a new trial and motion to amend the judgment, although timely filed, failed to raise as an issue on appeal the underlying judgment on the jury verdict. As a general rule, appeals from the denial of postjudgment motions do not bring the original judgment before the appellate court. See *West Springfield* v. *Olympic Lounge, Inc.*, 45 Mass. App. Ct. 923, 923-924 (1998); *Mariani-Giron* v. *Acevedo-Ruiz*, 945 F.2d 1, 3 (1st Cir. 1991). Even if we were to deem these issues properly before us, Daniel would fare no better. To the extent that she objects to the inclusion of erroneous instructions in the jury charge (and the failure to give certain instructions), she failed to bring these specific objections to the attention of the judge either before the jury began deliberations, as required by Mass.R.Civ.P. 51(b), 365 Mass. 816 (1974), or after the supplemental instructions. These objections, therefore, were waived. See *Cormier* v. *Pezrow New England, Inc.*, 437 Mass. 302, 311 (2002); *Jarry* v. *Corsaro*, 40 Mass. App. Ct. 601, 606-607 (1996).

---

[41]Nor is Mt. Ivy aided by the argument made in its reply brief. See *Cantell* v. *Hill Holliday Connors Cosmopulos, Inc.*, 55 Mass. App. Ct. 550, 556 n.7 (2002).

As for the denial of her motions for directed verdicts, Daniel failed to raise the specific grounds either orally or in writing that she now says support reversal of the judgment. Having failed to bring these alleged deficiencies to the attention of the judge or opposing counsel at trial, Daniel cannot raise these issues here. See Mass.R.Civ.P. 50(a), 365 Mass. 814 (1974) ("A motion for a directed verdict shall state the specific grounds therefor"). Contrast *Rhode Island Hosp. Trust Natl. Bank* v. *Varadian*, 419 Mass. 841, 846-848 (1995).

*Issues preserved on appeal.* We now address the only issues preserved for appeal.

a. *Daniel's postjudgment motions.* The only argument Daniel presses on appeal[42] is essentially a reconfiguration of her earlier preemption argument. Specifically, Daniel maintains that a new trial should have been granted because the trial judge improperly admitted evidence of violations of the Federal copyright laws by Daniel and Mt. Ivy, and the jury improperly considered copyright infringement claims in finding liability and in awarding damages. We have already addressed this issue. Suffice it to say that the mention of a copyright interest did not cause the trial to stray into forbidden subject matter. Ownership of the copyright interest was a relevant and essential issue at trial, as it bore on questions related to, e.g., breach of contract, conversion, and the G. L. c. 93A claims. As we have already determined (see discussion of preemption, *supra*), these were legitimate State law claims that were not equivalent to copyright infringement claims. Daniel has not directed us to examples in the record where the evidence she complains of was introduced in support of a copyright infringement claim. Nor has she demonstrated prejudice from the allegedly improper admission of such evidence. See G. L. c. 231, § 119; *G.E.B.* v. *S.R.W.*, 422 Mass. 158, 169 (1996).

b. *Judgment on the c. 93A claims.* A judge's findings of fact with respect to G. L. c. 93A claims will only be reversed if they are clearly erroneous. See *Kitner* v. *CTW Transp., Inc.*, 53 Mass.

---

[42]We do not reach the arguments Daniel attempts to preserve by the mere incorporation of papers previously submitted to the trial court. See *Matter of London*, 427 Mass. 477, 483 (1998).

App. Ct. 741, 747-748 (2002); *Diamond Crystal Brands, Inc.* v. *Backleaf, LLC*, 60 Mass. App. Ct. 502, 507-508 (2004).

Here, Mt. Ivy's and Daniel's first argument is yet another reiteration of their preemption arguments, which we have already addressed. Contrary to the defendants' argument, the findings and rulings forming the basis of their c. 93A liability arose from the many fraudulent, deceptive, coercive, and intimidating acts perpetrated upon Lee and Defonseca. None of these acts concerned violations of exclusive rights protected by the Act.

Mt. Ivy and Daniel next assert that a number of the factual findings were clearly erroneous. Even if we were to conclude that any one of these findings was clearly erroneous, the other evidence of unfair or deceptive business practices committed by Mt. Ivy and Daniel was legion. Indeed, while most c. 93A cases involve relatively few unfair or deceptive acts or practices, this case stands out for the sheer number of independent acts that would support liability under the statute.

Lastly, to the extent that Mt. Ivy and Daniel challenge the amount of damages awarded for their failure to use their best efforts in marketing and promoting the Work, there was ample testimony provided by Daniel herself to support the award.

*Conclusion.* We affirm the judgments, the orders denying Daniel's motions for a new trial and to amend the judgment, and the order allowing the motion to strike Mt. Ivy's notice of appeal from the denial of its motions for a new trial and to amend the judgment.

*So ordered.*