Fremont-Smith, Thayer, J.
This action arose out of Plaintiffs’ (collectively, Rudin) breach of contract claim against Palm Press, Inc. and its owner, Gus P. Kayafas (Kayafas). After Kayafas failed to file any responsive pleadings, the Court, pursuant to Mass.R.Civ.P. 55(b), entered a default judgment against him on the question of liability on September 29, 2007. The parties have since submitted affidavits and provided testimony on the issue of damages. In addition, Rudin has initiated a separate action against Kayafas for contempt.

BACKGROUND

After evidentiary hearings, the Court makes the following findings.
In early 2002, Kayafas and Rudin agreed to produce sixty-six portfolios, each consisting of twenty-two pho-togravure images, along with notes, essays, and commentary, from photographer Aaron Rose’s (Rose) body of work, “The Demolition of Pennsylvania Station.”[2] According to the terms of the contract, Kayafas would create the prints from the original photographs and produce the portfolios, and Rudin would personally invest $35,000 to fund the project. Kayafas would also bear responsibility for marketing and selling the portfolios. In exchange, Rudin would receive the first artist proof, proceeds from the sales of ten portfolios, and the right to purchase additional portfolios at a reduced price. The parties agreed that Rose’s share of the proceeds would benefit The Museum of the City of New York (Museum).[3] At the time, Rudin and Kayafas anticipated selling the portfolios in the range of $3,000 to $6,000 each.
The project was timed to meet the heightened demand following the exhibition’s premiere in the summer of 2002. Kayafas promised to complete the portfolios by January 2003. However, the project suffered numerous delays. In May 2003, Jon Goodman, a subcontractor Kayafas had hired to create the master plates for the project, contacted Rudin directly to advise him that Kayafas had failed to adequately fund the work. Rudin subsequently forwarded $4,776.00, the amount Goodman needed to finish the plates, in order to keep the project moving forward.
The project was substantially finished by October 2005, when Kayafas first began delivering presale portfolios to early investors and advertising the remaining trade editions to the public. Of the fifty trade edition portfolios ultimately produced, twelve were sold for $3,500 each. In accordance with the terms of the agreement, Kayafas distributed artist proofs to individuals closely involved with the project.[4] The remaining two bon a tirer (B.A.T.) edition portfolios were retained by the photograveurist, Goodman, as is customary in the industry. At the time this action commenced in May 2007, however, Rudin himself could account for only two portfolios and no proceeds from the twelve sales.
At a hearing on Rudin’s motion for a temporary restraining order on May 22, 2007, the Court ordered Kayafas to provide Rudin with an accounting of all the portfolios in his possession, and to transfer to him a certain number of those portfolios. In relevant part, the order called for Kayafas to,
[o]n or before June 1, 2007 ... produce an account concerning the number of portfolios produced, the cost of production, the number sold, the location of the funds from such sales. On or before June 8, 2007, Gus Kayafas shall forward . . . half of the number of “trade edition” portfolios that are in existence ... to a location as directed by Plaintiffs counsel.
*620 (Ct. Order, paper no. 6, 1, May 23, 2007.) Kayafas delivered eighteen portfolios to the Museum at Rudin’s direction on June 19, 2007. In addition, Kayafas produced a single-page spreadsheet account of all sixty-six portfolios to Rudin some time “in mid-2007.” (Contempt Hr’g Tr. 7, Sep. 12, 2008.) Rudin denies ever having received the document. Believing that Kayafas did not cooperate to the extent required by the order, Rudin initiated an action for contempt in this Court on August 27, 2008.

DISCUSSION

DAMAGES

The Court, having found Kayafas in default, accepts as admitted the well-pleaded factual allegations recited in the Complaint, for the purposes of establishing liability. Danaca Corp. v. Raytheon Co., 28 Mass.App.Ct. 942, 943 (1990). Furthermore, because the Complaint adequately stated claims for relief, Kayafas’s liability for two counts of breach of contract, two counts of misrepresentation, one count of unfair and deceptive trade practices in violation of G.L.c. 93A, and one count of copyright infringement, is conclusively established. See Multi Tech. v. Mitchell Mgmt. Sys., 25 Mass.App.Ct. 333, 335 (1988) (requiring that a complaint merely provide enough information to give defendant notice of the basis of the dispute and assert a cognizable theory of recovery). Whether Rudin is entitled to relief on each count remains an open question. A default does not concede the amount of damages, and the plaintiff bears the burden of proof on the issue. Bissanti Design/Build Grp. v. McClay, 32 Mass.App.Ct. 469, 470 (1992). Based on hearings and the evidentiary record, the Court awards Rudin damages only on the breach of contract and G.L.c. 93A claims.
The standard measure of recovery for a breach of contract is expectation damages. Sullivan v. O’Connor, 363 Mass. 579, 583 (1973). In order to place Rudin “in as good a position financially as [he] would have been in if there had been no breach,” the Court looks to the terms of the parties’ agreement. Pierce v. Clark, 66 Mass.App.Ct. 912, 914 (2006). The contract provided that Rudin personally would receive the proceeds from the sale of ten trade edition portfolios. Because Rudin anticipated that the portfolios would gamer $3,500 each, it is clear that the parties intended for him to recoup his initial investment in this manner. (Aff. of Eric C. Rudin in Supp. of Pis.’ Mot. for Assessment of Damages ¶13.) Therefore, Rudin is entitled to recover the original $35,000 contribution, plus the $4,776 emergency payment he made in May 2003.
Another important element of the agreement was the provision directing the Museum to benefit from the sales of the portfolios. According to Kayafas, the parties agreed that proceeds from portfolio sales would be divided into three portions, one of which would be paid to the Museum.[5] (Contempt Hr’g Tr. 10, Aug. 12, 2008.) At this time, Kayafas has returned no profits from the first twelve sales, to the Museum. In addition, Rudin claims damages from the portfolios’ alleged diminution in value caused by Kayafas’s delay in completing the project.
These facts could afford the Court sufficient grounds to consider awarding Rudin further expectation damages. However, the Court cannot grant the requested relief for several reasons. While it is reasonable to assume that the values of the portfolios have suffered as public interest has waned since the exhibition opened, Rudin has furnished no evidence on the point. Furthermore, Kayafas dispersed all the proceeds from the sales of the first twelve portfolios to cover the project’s production costs. Given that the parties agreed Kayafas would recoup production costs from sale proceeds, and absent evidence that the parties agreed to distribute the proceeds in any specific order, Rudin has not convinced the Court that he is owed any portion of the proceeds from those first twelve transactions.[6]
Pursuant to the May 2007 court order, Rudin now possesses eighteen portfolios, which Kayafas delivered to the Museum, and Kayafas possesses twenty. This arrangement is beyond the parties’ contemplation, as they intended for Kayafas to market and sell most, if not all, the portfolios. Rather than issue an order redistributing the portfolios and conceiving a new profit-sharing plan, however, the Court sees fit to preserve the status quo. In the Court’s view, any damages Rudin incurred from Kayafas’s production delays and subsequent dispersion of the proceeds from the first dozen sales are more than compensated by Rudin’s ability to freely dispose of the finished portfolios currently in his possession. In. order to avoid an inequitable result with respect to the Museum, the Museum will be permitted to sell and retain the profits from the sale of the eighteen portfolios, in satisfaction of its right to one-third of the portfolios.
A plaintiff may not duplicate his actual damages under a common-law theory and G.L.c. 93A, where the same conduct comprises the elements of both causes of action. Linthicum v. Archambault, 379 Mass. 381, 383 (1979). Because Rudin’s G.L.c. 93A claim fails to articulate a basis for recovery independent of the breach of contract claim, he is not entitled to recover additional actual damages on this count. For similar reasons, the Court will not double or treble the damages. Awarding multiple damages under G.L.c. 93A is only appropriate where the Court finds a “willful or knowing violation” of the statute. G.L.c. 93A, §9(1). Kayafas’s default alone does not entitle Rudin to multiple damages; rather the willful state of mind must be proved. Marshall v. Stratus Pharmaceuticals, Inc., 51 Mass.App.Ct. 667, 677 (2001). There is simply no evidence to suggest that Kayafas intended to deceive or mislead Rudin when he agreed to produce the project by January 2003. On the contrary, the production delays appeared to be at least partially the result *621 of unexpected health problems Kayafas experienced during the relevant period. (Contempt Hr’g Tr. 11, Aug. 12, 2008.) The evidence “more bespeaks a businessman who is operating one step ahead of — and eventually, behind — the bill collector, than a thief.” Gray v. Kayafas, 2007 WL 4248132 *2 [23 Mass. L. Rptr. 321] (Mass.Super., Nov. 13, 2007).
As a plaintiff having prevailed on a G.L.c. 93A claim, Rudin may recover reasonable attorneys fees and costs. G.L.c. 93A, §9(4); Linthicum, 379 Mass. at 388-89. Based on the affidavits submitted with Rudiris Motion for Assessment of Damages and Entry of Final Judgment, the Court awards attorney fees and costs in the amount $19,436.42.
With respect to Rudiris misrepresentation and copyright infringement claims, he has failed to meet his burden of proving damages.[7] Consequently, Rudin has no basis for recovery on those counts. See Hernandez v. Perez, 1995 Mass.App.Div. 131, 132 (1995) (upholding the trial court’s decision to award plaintiff no damages from defaulted defendant, where judge questioned plaintiffs credibility at assessment hearing).

CONTEMPT

The gravaman of Rudin’s complaint for contempt is Kayafas’s alleged failure to sufficiently comply with the Court’s May 2007 accounting order. In the Complaint and at the hearings, Rudin stated three different grounds for contempt. First, Kayafas did not deliver all the portfolios to Rudin, as required by the Order. Second, Kayafas did not produce the accounting mandated by the Court in a timely fashion. Finally, the account Kayafas did produce is insufficient because it did not includes copies of checks. The Court finds these arguments unpersuasive.
In order to establish a prima facie case of a civil contempt, the complaining party must show by a preponderance of the evidence that the party alleged to be in contempt disobeyed an unequivocal order of the court. United Factory Outlet, Inc. v. Jay’s Stores, Inc., 361 Mass. 35, 36 (1972). Therefore, a party is not in contempt unless there is a clear and precise command, and an equally clear and undoubted disobedience; however, evidence of intent to violate the order is not necessary. Id. at 36-37. Indeed, good faith is no defense to a charge of civil contempt. Godard v. Babson-Dow Mfg. Co., 319 Mass. 345, 349 (1946).
The language of the Order is straightforward. Although the term “account” may be susceptible to some interpretation, this is not a case where the context and purpose of a court order graft clear commands onto an otherwise ambiguous term. See, e.g., Judge Rotenberg Educ. Ctr. v. Comm’r of the Dept. of Mental Retardation, 424 Mass. 430, 448-49 (1997) (in light of a series of unethical attempts to undermine plaintiffs business, phrase “in good faith” imposed “clear and unequivocal” obligations on defendant). This is especially true of the Order in this case, where an enumerated list of requirements following “account” signaled how the parties should interpret the term. See Eldim, Inc. v. Mullen, 47 Mass.App.Ct. 125, 128 (1999) (terms of non-competition order were clear and unequivocal because they were taken essentially verbatim from consulting agreement that parties had agreed upon four years earlier). Here, the Court is careful not to expand the scope of the underlying Order beyond its plain meaning. See Peggy Lawton Kitchens, Inc. v. Hogan, 403 Mass. 732, 735 (1989) (a cookie manufacturer did not violate an injunction prohibiting use of a “precise” recipe, where it used a formula that merely “substantially derived” from the forbidden recipe).
The Court, therefore, cannot construe the Order as a clear and unequivocal command requiring Kayafas to produce copies of checks related to the project. Imposing an obligation to provide copies of checks would be a logical element of an accounting order. Yet demonstrating the logic of a requirement is not enough. It was incumbent on Rudin to demonstrate that Kayafas clearly failed to comply with an unmistakable command in the court order. Rudin has not met this burden, and the Court cannot hold Kayafas in contempt for not producing copies of checks where the Order merely called for “an account concerning the number of portfolios produced, the cost of production, the number sold, the location of funds from such sales . . .” See Ct. Order cited supra at 3.
Likewise, Rudin did not carry his burden of proof on the remaining allegations of contempt. Rudin insists that Kayafas never produced the account until after Rudin filed the Complaint for Civil Contempt in August 2008. Kayafas, on the other hand, maintains that he produced the document in mid-2007. Rudin has not come forward with an affidavit or other proof from the individual who allegedly received the account to rebut Kayafas’s claim. In the face of Kayafas’s sworn and credible testimony that he delivered the account in a timely fashion, the parties’ cases weigh equally. As a result, the Court again must conclude that Rudin has not proved noncompliance by a preponderance of the evidence.
The Court can only assume that Rudin was confused when making the argument that the Order obliged Kayafas to turn over all portfolios. Quite to the contrary, the Order clearly and unequivocally commanded Kayafas to “forward .. . half the trade edition portfolios that are in existence.” See Ct. Order cited supra at 3. Presumably in an attempt to comply with the Order, Kayafas transferred eighteen trade edition portfolios to the Museum at Rudin’s direction in June 2007. Kayafas had thirty-eight portfolios in his possession after he had sold twelve, so that, to comply with the Order, he should have transferred nineteen rather than eighteen. Nevertheless, the Court does not find that this omission constituted substantial disobedience of the Court’s May 22, 2007 Order, particularly *622 in view of the fact that Kayafas did comply with all other facets of the Order.

ORDER

Accordingly, the Court orders that final judgment shall be entered DISMISSING the Complaint for Contempt and awarding Eric Rudin damages against Gus P. Kaysfas in the sum of $59,212.42 plus interest.[8] The Court further orders that The Museum of the City of New York may sell and retain the profits from the sale of the eighteen portfolios in its possession.

Initialiy, the agreement called for only twenty images and sixty-four portfolios. The parties modified the terms of the original agreement, increasing the production of both portfolios and images.

For personal reasons, Rose believed it was appropriate that the Museum be the beneficiary of ‘The Demolition of Pennsylvania Station” portfolio. Rose gifted ownership of the body of work to the Museum, and the Museum held the portfolio’s first exhibition in the summer of 2002.

Kayafas produced fourteen artist proofs as a perk for insiders who contributed to the project. Rose received five proofs, essayists Robert Shamus and Robert Campbell each received one, the Museum received one, Eric Rudin received one, and an unidentified craftsmen also received one. Kayafas retained the other four proofs.

The other two portions were earmarked for Rudin personally, to cover his initial investment, and for Kayafas, to cover costs and expenses associated with producing, marketing and selling the portfolios, and, presumably, to compensate him for services rendered.

The actual contract itself is not in the record before the Court.

The Court doubts its subject matter jurisdiction to grant a damages award in the first instance. See 17 U.S.C. §301(a); 28 U.S.C. §1338(a) (granting exclusive jurisdiction to the Federal courts over all copyright infringement claims, including those that are deemed “equivalent” to copyright infringement claims). Cf. Lee v. Mt. Ivy Press, L.P., 63 Mass.App.Ct. 538, 550-554 (2005) (plaintiffs copyright infringement claims were not preempted by Federal law because they integrated extra elements beyond mere reproduction, such as a breach of a promise, fraud, misrepresentation, and conversion).

 $35,000 plus the $4,776 payment made by Rudin in May 2003, plus $19,436.42 in attorney fees.